NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240735-U

NOS. 4-24-0735, 4-24-0736 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.S. and Z.G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 20JA335 |
| v. | ) | 21JA128 |
| Michelle S., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Harris and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's judgment terminating respondent's parental rights, as the court's findings that (1) respondent was unfit and (2) termination was in the best interest of both minors were not against the manifest weight of the evidence.

¶ 2    Respondent Michelle S. appeals from the trial court's judgment finding her unfit and terminating her parental rights as to two of her minor children, M.S. (born in 2021) and Z.G. (born in 2017). The fathers are not parties to this appeal—Gabriel G., the father of Z.G., surrendered his parental rights to Z.G. in February 2024, and the father of M.S. was never identified, and all unknown fathers were defaulted on November 1, 2023. For the reasons that follow, we affirm the trial court's judgment.

¶ 3                          I. BACKGROUND

¶ 4          The present case arose out of an intact case commenced on February 14, 2020, based on reports that respondent's residence was infested with rats and roaches, she was not adequately supervising her children, and she allowed the minors to be around her paramour, who was a registered sex offender. At that point, the permanency goal was for the family to remain intact. In addition to M.S. and Z.G., respondent had three other children born between 2005 and 2011, whose custody cases proceeded separately.

¶ 5          A. Neglect Petitions, Adjudications, Dispositions, and Permanency Hearings

¶ 6                          1. *Z.G.*

¶ 7          On December 9, 2020, the State filed a petition alleging that Z.G. was neglected because respondent allowed controlled substances to be sold out of her home, she failed to cooperate fully with intact services, she allowed a sex offender to have access to the minor, and the environment was injurious to the welfare of the minor due to domestic violence between respondent and her paramour. After a shelter care hearing, the trial court granted temporary custody and guardianship to the Illinois Department of Children and Family Services (DCFS), which placed Z.G. with her father, Gabriel G.

¶ 8          On March 4, 2021, the trial court adjudged Z.G. to be neglected and granted custody and guardianship of Z.G. to DCFS. On March 31, 2021, the court entered a dispositional order in which it found that respondent was unfit and made Z.G. a ward of the court.

¶ 9          Due to ongoing issues in her father's home, Z.G. was removed from his care and moved to a traditional foster home on June 29, 2021. She was placed in other foster homes on September 23, 2021, and November 16, 2021, because the previous foster homes were found noncompliant with DCFS policies.

¶ 10 Between 2021 and 2024, the trial court held eight permanency review hearings as to Z.G. and ordered custody of Z.G. to remain with DCFS each time.

¶ 11 2. *M.S.*

¶ 12 Shortly after M.S. was born, the State filed a neglect petition based on anticipatory neglect due to her siblings being adjudicated neglected. Pending a further hearing on the State's petition, the trial court placed M.S. in temporary DCFS custody on October 27, 2021. DCFS placed her in the same foster home as Z.G.

¶ 13 The trial court adjudged M.S. neglected on April 20, 2022. At the dispositional hearing on May 18, 2022, the court entered a dispositional order in which it found that respondent was unfit and made M.S. a ward of the court.

¶ 14 Between 2021 and 2024, the trial court held six permanency review hearings as to M.S. and ordered that custody and guardianship should remain with DCFS each time.

¶ 15 B. Petitions for Termination of Parental Rights

¶ 16 On August 14, 2023, the State filed petitions for termination of respondent's parental rights to both Z.G. and M.S. On October 14, 2023, the State filed a supplemental petition for termination of parental rights as to M.S. to add a second nine-month period.

¶ 17 In these petitions, the State alleged that respondent was unfit because she failed to (1) maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2022)), (2) make reasonable efforts to correct the conditions which were the basis for the removal of the minors from her care within any of the applicable nine-month periods following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2022)), and (3) make reasonable progress towards the return of the minors to her within any of the applicable nine-month periods following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)). The three

relevant nine-month periods as to Z.G. were (1) March 4, 2021, to December 4, 2021; (2) December 4, 2021, to September 4, 2022; and (3) September 4, 2022, to June 4, 2023. The two relevant nine-month periods for M.S. were (1) April 20, 2022, to January 20, 2023, and (2) January 20, 2023, to October 20, 2023.

¶ 18                                    C. Fitness Hearing

¶ 19        The trial court held the fitness hearing on February 29, 2024, and May 2, 2024. At the State's request, with no objection from respondent, the court admitted into evidence 11 DCFS service plans. The State called DCFS caseworkers Tawnya Hackler, Chima Obidiegwu Jr., and Allison Smith, as well as DCFS supervisors Pandora Grey, Tiffanie Sisk, and Heather Hofferkamp. Both parties also called respondent to the stand. The following is a summary of the testimony and evidence presented at the hearing.

¶ 20                              1. *Services, Housing, and Employment*

¶ 21        Since February 2020, respondent's service plans required her to complete a substance abuse assessment and treatment, a mental health assessment and treatment, parenting classes, and domestic violence services, as well as find secure housing and cooperate with DCFS. The permanency goal was for the children to return home.

¶ 22        Hackler testified that she discussed the required services with respondent on the phone and in-person "any time [she] saw her." Hofferkamp testified that caseworkers are "required to attempt to meet with parents on a monthly basis," where they discussed with respondent "[t]he services that are required for the children to be returned home and then any referrals or barriers or anything that the department can do to facilitate meeting those service recommendations." Respondent sporadically attended child and family team meetings and administrative case reviews (ACR), which happened biannually. Respondent attended child and family team meetings in

March 2022, May 2022, and December 2023 but did not attend the meeting in November 2022 or the ACRs in June 2022, December 2022, or December 2023.

¶ 23    Respondent was referred to parenting classes but was dropped from them in 2021 "for failure to get on the calls for the meetings." Hackler informed respondent how important it was for her to complete these classes and made a second referral in June 2021. Respondent completed parenting classes in January 2022.

¶ 24    Respondent initiated services for substance abuse by completing the assessment in 2021 but did "not follow[ ] through or complete[ ]" the services. Respondent was discharged from substance abuse programs for nonattendance at least four times: three times from Family Guidance Center in 2021, 2022, and 2023, and once from Gateway in 2024. When she reenrolled at Family Guidance Center for the third time in 2023, she did "very well for a couple of weeks in May," but then went "back to canceling when she is supposed to do in-person visits." Because "[s]he [did] not show up for her in-person" appointments, she also missed the accompanying drug drops. As of May 2024, respondent had not completed a substance abuse program. Respondent acknowledged that she was requested to complete substance abuse treatment as part of her services, but she never did. She noted that she planned to restart substance abuse services at Family Guidance Center in May 2024.

¶ 25    Respondent did not initially engage in domestic violence services but completed an assessment in March 2021 and began attending sessions. Though respondent reported to Smith in June 2022 that she had disengaged from domestic violence services because they occurred while she was "in bed," she eventually completed them in November 2022.

¶ 26    Respondent also initiated mental health services by completing an assessment in April 2021 but did not initially follow through or complete them. Obidiegwu reported that between

September 2021 and June 2022, respondent was engaged in mental health services. Grey and Smith both testified that respondent attended mental health services "sporadically." Respondent was discharged from mental health services in 2022 but reenrolled after March 2023. As of May 2024, respondent was still engaged in but had not completed mental health services. Respondent testified that she was still seeing a psychiatrist and counselor.

¶ 27 Respondent initially had appropriate housing, where visitation with the minors was conducted. However, respondent was evicted from her home in August 2022 and began residing with other people, including her cousin, sister, and foster mother. Respondent would not allow Smith to inspect any of these homes, so visitation had to be moved to locations in the community. Respondent testified that she planned to move to her own place in May 2024.

¶ 28 Respondent claimed to have regular employment until September 2022 but, according to Grey's testimony and Hackler's and Obidiegwu's service plan evaluations, she "continually refused to provide any verification or proof that she was employed." Respondent had no regular employment since September 2022 and began receiving Social Security in late 2022 or early 2023.

¶ 29 Smith additionally testified that respondent "never volunteer[ed] any information" and "d[id]n't tell [her] when she move[d]" or "ha[d] a new phone number, which [wa]s often." Smith only found out that respondent's address or phone number changed when she was "trying to schedule a home visit."

¶ 30 2. *Drug Use*

¶ 31 Respondent had a history of substance abuse, which was one of the reasons the children were initially taken into care. Obidiegwu, Smith, Sisk, and Hofferkamp agreed that

respondent's drug use remained an "ongoing concern" throughout the entire case. Respondent admitted to testing positive for cocaine and other illegal drugs during this case.

¶ 32         According to Obidiegwu, respondent completed some drug drops and failed to appear for one of them while he was assigned to the case. Obidiegwu testified that respondent "had positive drug drops on multiple occasions, *** primarily [for] cocaine and methamphetamine." Specifically, respondent tested positive for cocaine 10 times throughout this case, in December 2021, January, March, April, May, and July 2022, and March, June, July, and October 2023. In March, April, May, and July 2022, respondent also tested positive for methamphetamine and amphetamines. Respondent also tested positive once for cocaine at Family Guidance Center.

¶ 33         Obidiegwu testified that when the positive results came back, respondent "denied having positive drops" and claimed not to "know how or why it would have recorded as positive," though she "did admit to one positive drop" for cocaine in May 2022. Obidiegwu stated that he communicated to respondent the importance of staying sober and that failing to do so would hinder her in getting her children back. He further testified that he would not return a child to a mother with a continuing cocaine problem.

¶ 34         Respondent also continued to miss required drug drops. Respondent missed three drug drops in September 2022 and refused to engage in a new color-coded drop system. Respondent claimed to have done drug tests at Family Guidance Center, but Smith stated in a June 2023 service plan evaluation that "this was reported to not be true"; rather, respondent "only tested a couple of times." Between May 2022 and June 2023, respondent "failed to complete any of the 14 drug drops [Smith] arranged for her to do." The December 2023 service plan evaluation, admitted as People's exhibit No. 11, states that respondent had failed to appear 10 times. Between

January and May 2024, respondent failed to appear an additional 10 times—all of the drops she was scheduled to do in 2024.

¶ 35      Respondent claimed to have been sober since her last positive drug test in October 2023. However, DCFS considers missed tests positive because it renders them "unable to test and document the sobriety of the client." Therefore, even though the last documented positive drug test was in October 2023, Hofferkamp could not confirm respondent's sobriety between then and May 2024 due to respondent's many failures to appear.

¶ 36                                    3. *Visitation*

¶ 37      Respondent regularly attended supervised visits with her children once a week for two hours, where she generally behaved appropriately. According to Smith, respondent attended 80% of her visits with her children. During these visits, she provided food, snacks, clothing, and toys, and she was hands-on and loving with her children. These visits were initially held in her home; however, after she was evicted in August 2022, the visits moved to locations in the community.

¶ 38      Each caseworker and supervisor testified that respondent's visits were supervised but never increased in frequency or became unsupervised. Sisk testified that the trial court granted the right to place in February 2022, which usually indicates that the court was under the belief that respondent "was making efforts and progress" at that point. She stated that when she "initially got the case, it seemed like [respondent] was doing well," so in March 2022, Sisk "made a critical decision to increase visits for [respondent]." However, before increased visitation or placement could be contemplated, respondent tested positive for cocaine, methamphetamine, and amphetamines in March 2022, so Sisk "decided [they] were not going to be able to increase that

until [respondent] started complying with substance abuse treatment." At that time, Sisk explained to respondent why her visits would not be increased.

¶ 39 Around June 2022, respondent told Z.G. that she did not have to "answer to *** the foster parent" because "she's not your mom and she's white," which, according to Smith, was "just really confusing to [Z.G.]" Because of these comments, Z.G. reacted negatively and required intensive counseling to resolve the issues. A new visitation specialist was assigned to the case to ensure that respondent was being properly monitored during visitation; afterward, respondent's comments decreased and Z.G.'s stability in the placement improved. By June 2023, Z.G. had completed intensive counseling and was no longer having the problems that led her to be placed in counseling. However, Smith also reported that respondent had not seen her children between March and June 2023.

¶ 40 In June 2023, the trial court changed the permanency goal to substitute care pending court determination. Respondent's visitation consequently changed from weekly to monthly.

¶ 41 Respondent testified that her visits with her children went well, she played with them and provided food, and she wished for them to return home.

¶ 42 4. *Service Plan Evaluations*

¶ 43 Respondent did not complete any of the required services before or during Hackler's time on the case, between February 2020 and August 2021; as a result, Hackler's June 2021 service plan evaluation was rated unsatisfactory.

¶ 44 Obidiegwu rated respondent's progress as satisfactory in October 2021. Though Obidiegwu testified that it "was looking like" respondent was working toward the return of her children, reunification did not occur during his time on the case. He confirmed that the trial judge

had granted DCFS the right to place the minors with respondent in February 2022 but that the children were never placed with respondent.

¶ 45 Smith authored four service plan evaluation reports—in June 2022, November 2022, June 2023, and December 2023. Each report rated respondent's progress as unsatisfactory. Smith testified that respondent had "never been fully engaged" and was "always hit or miss" with most of her services. In June 2022, Smith reported that she had explained to respondent that her service plan had been rated unsatisfactory "due to illegal substance use and continued need of substance abuse treatment." Sisk and Hofferkamp likewise testified that respondent's progress was unsatisfactory in these months because "[n]one of the parents were correcting the conditions and working on all of their services to work towards reunification" and "[t]here was a continued lack of engagement in substance abuse treatment."

¶ 46 Hackler, Smith, Grey, Sisk, and Hofferkamp each testified that there was never a time that they were close to returning the children to respondent.

¶ 47                              5. *Trial Court Findings*

¶ 48 After hearing argument, the trial court announced its factual findings as to respondent's unfitness. The court acknowledged that respondent completed parenting classes and domestic violence services, which were both important, and that she had "been in counseling somewhat sporadic[ally]." However, it remarked that "the issue that's gone on *** from the beginning to end of this case is substance abuse," which was "still an issue" and "clearly *** has not been addressed *** through the life of this case." The court noted that there was "a huge number of positive [drug] tests" and that respondent had "thwarted us from [knowing] whether or not she's positive" by failing to appear 13 times before March 2023 and 10 times in 2024. The court stated that placement "was never given," as the "series of positive [drug] tests started

- 10 -

coming." The court emphasized that "[n]o worker, no supervisor ever stated they were close to being able to return these children," and the "one time they were close to increasing visits, [respondent] sabotaged that by testing positive."

¶ 49    Based on these facts, the trial court found that the State showed by clear and convincing evidence that respondent was unfit because she (1) "failed to maintain a reasonable degree of responsibility as to the minors' welfare by this continued drug use" and (2) "failed to make reasonable efforts and progress to address some significant issues" during the nine-month periods alleged in the State's petitions.

¶ 50                    D. Best-Interest Hearing

¶ 51    The trial court proceeded to a best-interest hearing the same day. The State recalled Hofferkamp to testify. Hofferkamp stated that M.S. and Z.G. had been in a traditional foster home since November 2021. They were doing "[r]eally well," "making progress," and were "engaged with things with school and friends and [were] well adjusted." Z.G. was enrolled in first grade and M.S. was in daycare. The foster parents and home were meeting the children's medical, social, and emotional needs. There were three other foster siblings in the home, with whom the children got along. The foster parents had already "signed the agreement to say that they are interested in providing permanency for the children." Though there was a bond between the children and respondent, whom they called "mom," there was also a bond between the children and the foster parents, whom they called "mom and dad." Hofferkamp testified that it was in the best interest of the children to stay in their current placement and terminate respondent's parental rights.

¶ 52    Respondent testified again, stating that she had a bond with and loved her children, she had no communication with the foster parents, her visits with her children went "extremely

- 11 -

well," she would like an ongoing relationship with them if her rights were terminated, and she believed it was in the children's best interest to be returned to her.

¶ 53 The trial court took judicial notice of the unfitness proceedings before ruling on the minors' best interest. The court noted that the children's needs were being met and that the foster home was "almost the only home [M.S.] has ever known" and had been Z.G.'s home for "two-and-a-half years of her seven years." The court acknowledged that they called respondent "mom" and had a bond with her, but that they also "call[ed] these foster parents mother and father" and likewise had a bond with them. The court called attention to the fact that the children had "never had more contact [with respondent] than two hours a week" while "supervised by someone else." The court emphasized that even though respondent "stat[ed] she's going to start drug treatment again, *** we've gone through a significant amount of time for both of these children," so it was not "in the children's best interest *** to wait longer for [respondent] to go to treatment to determine if there is going to be a period of stability." Respondent had "three other opportunities to go through drug treatment" and she would need to have "a long period, even if she went through treatment of continued drops to know whether *** it's going to kick in this time." The court highlighted that the minors "deserve permanence" and "need to know what their future holds" and "where they're going to be permanently," "[p]articularly for [Z.G.]" It found that the minors were both "too young to really weigh in" on their placement.

¶ 54 Based on these facts, the trial court found that the State showed by a preponderance of the evidence "that it is in the best interest of both minors that the parental rights of [respondent] *** be terminated." Thereafter, respondent filed separate notices of appeal in each case. On our own motion, we consolidated the appeals.

¶ 55                                    II. ANALYSIS

¶ 56            Initially, we note that this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, respondent's notice of appeal was filed on May 2, 2024, and this court's disposition was due to be filed by September 30, 2024. That filing deadline has passed. However, this delay is due to a necessary change in the briefing schedule. Respondent filed her appellant's brief on June 26, 2024. On July 5, 2024, the State moved to dismiss the appeal or, alternatively, to strike respondent's brief for failure to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020) on the grounds that respondent's brief discussed only the trial court's 2022 order finding the children neglected, rather than the 2024 order terminating respondent's parental rights. The State also asked for an extension of time to submit its brief, which this court granted. On July 29, this court denied the State's motion to dismiss but granted the motion to strike appellant's brief. In consideration of the gravity of the rights involved in this appeal, and to ensure that respondent receives effective assistance of counsel, we ordered respondent to file a new brief complying with Rule 341 by August 19, 2024. Briefing was completed on September 16, 2024. In light of the delay resulting from the new briefing schedule, we find that good cause exists to issue our disposition after the 150-day deadline.

¶ 57            On appeal, respondent contends that the trial court's findings that (1) she was unfit to parent M.S. and Z.G. and (2) it was in the best interest of both minor children to terminate respondent's parental rights were against the manifest weight of the evidence.

¶ 58                                    A. Unfitness

¶ 59            The involuntary termination of parental rights involves a two-step process pursuant

to section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)). The

State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*,

305 Ill. App. 3d 154, 163 (1999).

¶ 60            The trial court found respondent unfit for failing to (1) maintain a reasonable degree

of responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2022)), (2) make

reasonable efforts to correct the conditions which were the basis for the removal of the child from

the parent during three nine-month periods for Z.G. and two nine-month periods for M.S. (750

ILCS 50/1(D)(m)(i) (West 2022)), and (3) make reasonable progress toward the return of the child

to the parent during three nine-month periods for Z.G. and two nine-month periods for M.S. (750

ILCS 50/1(D)(m)(ii) (West 2022)). However, "[a] parent's rights may be terminated if a single

alleged ground for unfitness is supported by clear and convincing evidence." *In re D.C.*, 209 Ill.

2d 287, 296 (2004). As such, we only address whether the court reasonably found that respondent

failed to make reasonable progress toward the return of the children during the relevant nine-month

periods. We conclude that it did.

¶ 61            Reasonable progress, which is assessed under an objective standard, exists when a

parent's compliance with the service plan and the trial court's directives "is sufficiently

demonstrable and of such a quality that the court, in the *near future*, will be able to order the child

returned to parental custody." (Emphasis in original). *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

"A trial court should not return a child to a parent's custody if the conditions are unsafe." *In re*

*Ta. T.*, 2021 IL App (4th) 200658, ¶ 55. " ' "[F]ailure to make reasonable progress toward the

return of the child to the parent" includes *** the parent's failure to substantially fulfill his or her

obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). If "the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives, then a finding of unfitness is appropriate." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 62        We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54.

¶ 63        The three relevant nine-month periods as to Z.G. were (1) March 4, 2021, to December 4, 2021; (2) December 4, 2021, to September 4, 2022; and (3) September 4, 2022, to June 5, 2023. Between March 2021 and December 2021, respondent's service plan was evaluated once as unsatisfactory and once as satisfactory. As of August 2021, respondent had not completed any of the services recommended by the service plan. She had not initiated mental health or domestic violence services, was dropped from parenting classes for nonattendance, failed to keep any scheduled sessions with her substance abuse counselor at Family Guidance Center, and had not been able to increase her visitation with her children. Between September and December 2021, respondent was dropped from substance abuse treatment at Family Guidance Center for nonattendance, though she had initiated mental health and domestic violence services. Hackler and her supervisor, Grey, who were assigned to the case during this nine-month period, testified that there was never any time that the children were close to being returned.

¶ 64        During the second nine-month period, between December 4, 2021, and September 4, 2022, respondent's service plan was twice rated unsatisfactory. Respondent completed parenting

classes in January 2022 and was engaged at times with mental health and domestic violence services. Although the trial court granted DCFS the right to place the minors with respondent, placement was never granted because respondent tested positive for cocaine, methamphetamine, and amphetamines just one month later. Smith reported that between May and August 2022, respondent had stopped attending domestic violence services, had been discharged from mental health services and reenrolled, and had been evicted from her home. Additionally, respondent made inappropriate comments to Z.G. about her foster parents during visits, which caused Z.G. to react negatively and require intensive counseling. During this nine-month period, respondent tested positive for cocaine and other illegal substances six times and failed to appear several times. While respondent completed parenting classes and sporadically engaged with other services, this does not constitute substantial compliance with the service plan given her failure to cooperate with DCFS, inappropriate conduct during visitation, lack of engagement in substance abuse services, and continued positive drug tests.

¶ 65 The last relevant nine-month period as to Z.G. was between September 4, 2022, and June 5, 2023. During this period, respondent's service plan was twice rated unsatisfactory. Respondent completed a domestic violence program. However, respondent (1) was discharged from mental health services for nonattendance, (2) did not inform her caseworker when she moved or changed phone numbers, (3) was terminated again from substance abuse services at Family Guidance Center for nonattendance, (4) refused to allow her caseworker to assess the safety of her home for visitation, (5) refused to engage in a new random drug test program, (6) did not have regular employment, (7) missed all of her visits with her children between March and June 2023, and (8) failed to attend a child and family team meeting in November 2022 and an ACR in December 2022. Though she reenrolled at Family Guidance Center in January 2023, she continued

to miss or reschedule individual appointments. Additionally, respondent had tested positive for cocaine twice and failed to attend 13 drug drops before March 2023. Both Smith and her supervisor, Sisk, testified that there was never a time that they were close to returning the minors to respondent due to the ongoing substance abuse and failure to engage in substance abuse treatment.

¶ 66　　　The two relevant nine-month periods for M.S. were (1) April 20, 2022, to January 20, 2023, and (2) January 20, 2023, to October 20, 2023. As discussed above, respondent failed to substantially comply with her service plan during that period between April 20, 2022, and June 5, 2023. Between June and October 2023, respondent did not make any further progress. She (1) was discharged from Family Guidance Center again in late 2023, (2) tested positive for cocaine four times between June 5 and October 20, and (3) did not have adequate housing or stable employment. Respondent thus failed to substantially comply with her service plan during the second relevant nine-month period as to M.S.

¶ 67　　　In sum, while respondent completed parenting classes and domestic violence services and was sporadically engaged in mental health services, she never completed substance abuse treatment, never received increased or unsupervised visitation, continually tested positive for cocaine and other drugs, and failed to appear for drug tests. The trial court reasonably determined that respondent's sporadic engagement in some services did not constitute substantial compliance with her service plan. Substance abuse was one of the conditions that caused the minors to be brought into care, and it remained "an ongoing concern" throughout the case. "A trial court should not return a child to a parent's custody if the conditions are unsafe," and returning children to a parent with ongoing substance abuse issues would be unsafe. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55. Respondent's failure to engage in or complete treatment addressing this issue

thus rendered her compliance with directives not " 'sufficiently demonstrable [or] of such a quality' that the child[ren] will soon be able to return home." (Emphases omitted.) *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55 (quoting *L.L.S.*, 218 Ill. App. 3d at 461). As the court pointed out at the hearing, "[n]o [DCFS] worker, no supervisor ever stated they were close to being able to return these children" to respondent. We hold that the court's finding of unfitness was not against the manifest weight of the evidence.

¶ 68                                    B. Best Interest

¶ 69           If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. See *In re D.T.*, 212 Ill. 2d 347, 364 (2004) ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). As such, the burden on the State is a preponderance of the evidence at the best-interest hearing. *D.T.*, 212 Ill. 2d at 366.

¶ 70           When determining a minor's best interest, the trial court must consider the following factors, "in the context of the child's age and developmental needs":

          "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

          (b) the development of the child's identity;

          (c) the child's background and ties, including familial, cultural, and religious;

          (d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 71　　　　The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 72　　　　At the time of the hearing, Z.G. was seven years old and had been in care for almost three years, while M.S. was two and a half years old and had been in care for her entire life. Between March 2021 and June 2023, respondent visited with Z.G. and M.S. approximately once

a week for two hours; after the permanency goal was changed in June 2023, respondent visited them about once a month. Thus, for almost a year before the hearing, they had only seen respondent once a month for two supervised hours. The evidence demonstrated that the foster parents provided for all of the children's needs and had bonded with them; both children called their foster parents "mom and dad." Both Z.G. and M.S. were enrolled in school or daycare and doing well; they also got along with the other three foster children in the home. The only issue that arose during their two and a half years in their current foster home was caused by respondent telling Z.G. that she did not have to listen to her foster parents because they were not her real parents; however, this issue was resolved after Z.G. received intensive counseling and a new visitation specialist was assigned to the case to ensure that respondent was monitored during visitation. The foster family agreed to provide permanency to both children. Though Hofferkamp acknowledged that the children have a bond with respondent, she testified that it would be in the best interest of the children to stay in their current placement. The trial court considered and weighed all these factors before determining that terminating respondent's parental right was in the minors' best interest.

¶ 73 Based on the foregoing, the trial court's best-interest determination was not against the manifest weight of the evidence. After waiting for three years for respondent to complete her services and move toward reunification with almost no progress, the court's emphasis on the minors' need for permanency was not misplaced.

¶ 74                                III. CONCLUSION

¶ 75 For the reasons stated, we affirm the trial court's judgment.

¶ 76 Affirmed.