NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 241068-U

NO. 4-24-1068

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 16, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.L., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 22JA30 |
| v. | ) | |
| Tara L., | ) | Honorable |
| Respondent-Appellant). | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Zenoff and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court's determination that
respondent failed to make reasonable progress toward the return of her child in
the relevant nine-month period was not against the manifest weight of the
evidence.

¶ 2    Respondent, Tara L., appeals the order of the trial court terminating her parental

rights to her daughter, L.L. (born in 2022). She argues the court applied the incorrect legal standard

when determining her parental fitness and the determination itself was against the manifest weight

of the evidence. We affirm the decision of the trial court.

¶ 3                                  I. BACKGROUND

¶ 4    On March 4, 2022, the Illinois Department of Children and Family Services

(DCFS) filed a petition alleging L.L. was neglected in that her environment was injurious to her

welfare (705 ILCS 405/2-3(1)(b) (West 2022)). The petition alleged that DCFS received a hotline

call stating respondent had given birth to L.L. and tested positive for benzodiazepines with no prescription for the drugs. Respondent had previously been found unfit in two separate juvenile matters regarding her other two children, and at the time of L.L.'s birth, she had not completed services to restore her fitness.

¶ 5 On the same day, the trial court entered a temporary custody order, finding an immediate and urgent necessity to remove L.L. from respondent's care. Temporary custody was given to the guardianship administrator of DCFS, with authorization to place the minor. Respondent stipulated to the allegations in the petition, and on July 1, 2022, L.L. was adjudicated neglected and made a ward of the court. Respondent was ordered to perform the following tasks to correct the conditions that led to L.L.'s removal: cooperate with DCFS; obtain and maintain stable housing; visit as scheduled with L.L.; and successfully complete a psychological exam and any recommended treatment, a substance abuse assessment and any recommended treatment, parenting classes, counseling, and domestic violence classes. She was also required to submit to random testing for alcohol and drugs at least three times a month.

¶ 6 On August 30, 2023, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent was unfit for failing to make reasonable progress toward the return of L.L. during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)). The relevant nine-month period was November 22, 2022, through August 22, 2023.

¶ 7 The trial court heard evidence on the State's petition. Angela Sinclair Hawley, a licensed clinical social worker, testified on behalf of respondent. She stated she had seen respondent weekly for approximately two years. She testified that respondent had a troubled history, beginning around the age of 14, when her parents divorced and she began associating with

the "wrong crowd." Respondent was exposed to domestic violence between her parents and experienced domestic violence herself in her relationship with the father of her first child, again when she was around 14 years old. Hawley testified that respondent's past led her to develop "armor" for protection, which impacted how she interacted with agency personnel over the course of her children's cases. Hawley stated that respondent was distrusting of the system and those working within it and became defensive when she felt attacked. Nevertheless, Hawley believed respondent had progressed in managing her emotions and was taking her services seriously.

¶ 8        Angela Venzon, a child welfare specialist at Children's Home Association of Illinois (agency), testified for the State. Venzon stated she assumed L.L.'s case after her birth in 2022, but she was originally assigned to respondent's other children, J.L. and E.T., who entered care after allegations of abuse by respondent in 2021. She testified that respondent had a 16 year history with DCFS, beginning when J.L. was 4 months old, which included 33 investigations and 5 indicated reports.

¶ 9        Venzon testified that in order to reunite with her children, respondent was required to complete parenting classes, domestic violence classes, individual counseling, family therapy when deemed appropriate, psychiatric and psychological evaluations, and a parenting capacity assessment. She was also required to cooperate with the agency. Prior to the petition's nine-month period, respondent completed parenting classes, domestic violence classes, and a psychological evaluation. She also completed 27 out of 33 drug drops during the nine-month period. She did not complete a psychiatric evaluation, but Venzon testified this was through no fault of her own and was the result of not meeting certain criteria necessary to receive a full evaluation. She was engaged in counseling over the nine-month period, attended visitations with L.L., and, at the end of the period, completed a parenting capacity assessment.

¶ 10 Yet despite respondent's completion of certain services, Venzon testified that the agency did not see any application of the skills or tools that she was reportedly learning. She stated that respondent repeatedly struggled with taking responsibility for her actions. For example, at a hearing on August 22, 2023, she accepted responsibility for abusing J.L., but a transcript from a hearing on August 9, 2023, was admitted into evidence wherein she called J.L. a liar, manipulative, and a "psychopath." Similarly, the parenting capacity assessment dated August 15, 2023, stated she took no responsibility for hurting her children and showed no remorse; instead, she maintained that she was a victim of both J.L. and the agency.

¶ 11 Venzon recounted an incident from February 2023, at which time J.L. and his younger sister E.T. were placed with their maternal grandmother. During a scheduled visit to the foster home, Venzon noticed J.L. appeared anxious and nervous. When she asked J.L. if he was safe, he told her he was not and that respondent had been making frequent, unauthorized visits to the foster home. At the time, respondent was allowed only supervised visits with her children. Venzon testified that J.L. was

> "very, very scared of getting in trouble by both [respondent] and [the foster mother], maternal grandma. He said that had been going on for awhile, but he couldn't take it anymore. *** [H]e did not like the way he was treated by mom and grandma. It sounded like there was verbal abuse and at least one incident of a physical altercation."

Elaborating on the physical altercation, Venzon stated, "there was a broom involved, and mom hit [J.L.] with a broom handle or he got hit with a broom handle while him and his mother were fighting."

- 4 -

¶ 12          Venzon and other agency personnel returned to the foster residence that night and found respondent hiding in a closet. Venzon stated that respondent's story of why she was at the foster home of her two eldest children without authorization changed multiple times, with her first alleging she only stopped by to pay her daughter's tutor, and then stating J.L. asked her to come over and forcibly dragged her into the house, making her hide in a closet when Venzon and other workers arrived. Venzon stated both children were greatly impacted by being forced to lie to authorities about respondent's visits.

¶ 13          Further, although respondent was supposed to work on emotional control and regulation in her counseling sessions, Venzon testified she did not see any changes to her behavior in that regard. Respondent was argumentative in family meetings with agency personnel, asserting that workers were not answering her questions when, according to Venzon, her questions were being answered, but "they might not be the answers that she wanted to hear." She also repeatedly asked for new caseworkers and supervisors, believing she was being treated unfairly. Venzon stated the meetings were "very unproductive because there was a lot of repetition and a lot of speaking in circles and a lot of blame placed."

¶ 14          Venzon testified that respondent's psychological assessment identified antisocial personality disorder as a diagnosis. The assessment stated that if respondent did not acknowledge wrongdoing, there would be minimal change in the conditions that brought her children into care. When asked if she believed respondent had made progress in her service plan toward the return home of L.L. in the relevant nine-month period, Venzon stated she did not. She further noted that respondent's actions regarding her two older children, including her "lengthy history of abuse and neglect," were important considerations for the agency in its evaluation of respondent's ability to care for L.L.

¶ 15     Joanna Tyler, the director of the Child Clinic at the Antich Group in Illinois, testified that she evaluated respondent for the parenting capacity assessment in August 2023. The assessment evaluated respondent's ability to meet L.L.'s needs and to determine if she could provide fit and adequate care. Tyler stated that individuals with antisocial personality disorder do not have a conscience in the way that people usually do and can harm others and break the law without feeling guilt or remorse. Tyler also stated that, during the assessment, respondent repeated her view that she was a victim of DCFS. Tyler did not believe respondent could be honest because she had a false view of reality, meaning that she, herself, was unaware that she was lying. When asked what this meant for L.L., Tyler stated that while respondent could care for L.L. in terms of feeding and changing diapers, "the area of concern was not being able to parent in a safe manner. There wasn't remorse. How would we not repeat whatever those behaviors were, right, because there wasn't even—an acknowledgment."

¶ 16     Respondent testified that her parenting was negatively affected by her anger and failure to handle certain situations with her children as she should, but she stated she was working with her counselor to control her emotions and approach situations differently. She testified that she had gained a lot of patience and where she used to react defensively, she was learning to react more calmly. She stated that while she initially struggled to accept that she abused her children, she did so now. When asked if she had called her son a liar and denied hurting him in the parenting capacity assessment, she stated she did not recall the statements she made at that time.

¶ 17     The State argued in closing that while respondent may have completed certain services, there was no steady and measurable progress toward returning L.L. home because of respondent's deception and inability to take responsibility for her actions. The guardian *ad litem* (GAL) for L.L. echoed the State's sentiments, stating that respondent "did do services and checked

boxes off, but the problem is [ ] that any progress that [respondent] would have made or would have been perhaps measurable was undermined by her deception, her going outside of the perimeters that were imposed for the safety of her children." The GAL described respondent's actions as a clear disregard for the needs and best interest of her children. Counsel for respondent countered that respondent had been dealt a difficult hand in life and may have experienced ups and downs in her progress as a result, but her overall successes and efforts showed she made reasonable progress toward the return of her child.

¶ 18　　　　The trial court agreed with the State, finding respondent failed to make reasonable progress toward the return of L.L. within the relevant nine-month period and was therefore unfit. The court explained that respondent's psychological assessment showed she easily met the three criteria for antisocial personality disorder: deceitfulness, lack of accountability, and irritability and aggression. The court stated, "[Respondent] did the best that [she] could do, but again, suffering from this in essence disability, even this—even this report shows that the likelihood of change is minimal." The court emphasized respondent's anger, her lack of responsibility, and her disregard for her children's needs in making its decision.

¶ 19　　　　A best-interest hearing was held immediately after, at which Venzon again testified, along with L.L.'s foster mother. Both stated L.L. was well cared for and loved in her current placement. Counsel for respondent did not offer any evidence or make an argument at the best-interest hearing, stating, "Since we respectfully disagree with the Court's conclusion on termination of parental rights, that's my only input." The court found it was in the best interest of L.L. that respondent's parental rights be terminated.

¶ 20　　　　This appeal followed.

¶ 21　　　　　　　　　　　　　　II. ANALYSIS

¶ 22 On appeal, respondent challenges only the trial court's unfitness finding. She argues that the court "applied the incorrect legal standard" in that it did not find her unfit for failing to make reasonable progress in the relevant nine-month period, but rather for her inability to "discharge her parental responsibilities due to mental impairment, mental illness, or intellectual disability" under section 1(D)(p) of the Adoption Act. 750 ILCS 50/1(D)(p) (West 2022). Respondent notes that this ground of unfitness was not alleged by the State in its petition and therefore, "the trial court's apparent conflation of the aforesaid grounds for termination requires reversal." Respondent further argues that even under the correct grounds of unfitness, the court's determination was against the manifest weight of the evidence in light of the services she completed and the fact that she eventually took responsibility for her actions involving J.L.

¶ 23 The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) creates a two-part process for termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). First, the State must prove, by clear and convincing evidence, that a parent is unfit as the term is defined in section 1(D) of the Adoption Act. *Id.* at 494-95. Then, after a finding of unfitness, the trial court must determine if it is in the minor's best interest that the parent's rights be terminated. *Id.*

¶ 24 Under section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit if she fails to make a reasonable degree of progress toward the return of the child during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2022).

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later

become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

Reasonable progress exists where a parent's compliance with directives is of such a quality that the trial court will be able to order the child returned to parental custody in the near future. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 55. In any hearing under the Juvenile Court Act, proof of the abuse or neglect of one minor is admissible evidence on the issue of the abuse or neglect of another minor for whom the respondent is responsible. 705 ILCS 405/2-18(3) (West 2022). We will not reverse the unfitness determination of the trial court unless it is against the manifest weight of the evidence, or, in other words, where the opposite conclusion is clearly evident. *C.N.*, 196 Ill. 2d at 208.

¶ 25      To begin, we reject respondent's argument that the trial court, in essence, found her unfit on the ground that her mental illness prevented her from exercising her parental duties, an unfitness basis that was not alleged in the State's petition. It is true that the court referenced respondent's antisocial personality disorder diagnosis in its reasoning, but this is only because it was relevant to respondent's failure to make reasonable progress, the ground of unfitness alleged by the State. Evidence of impairment from mental illness can support multiple grounds of unfitness. See *In re D.D.*, 2022 IL App (4th) 220257, ¶ 44 (considering a parent's lack of progress in mental health treatment in determining her unfitness under section 1(D)(m)(ii) of the Adoption Act). While it may be true that the evidence presented by the State could also have shown respondent unfit under section 1(D)(p) of the Adoption Act, this is ultimately irrelevant. The only question before the court was whether the evidence sufficiently proved respondent unfit under section 1(D)(m)(ii), the failure to make reasonable progress in the alleged nine-month period. Her mental illness, and what the court considered to be a lack of success in managing it, were relevant

considerations in this inquiry. We therefore reject respondent's argument that where a trial court considers a parent's mental illness, it must be effectively finding her unfit on grounds of mental impairment under section 1(D)(p) of the Adoption Act.

¶ 26 We next consider whether the trial court's conclusion of unfitness was against the manifest weight of the evidence. Evidence presented at the fitness hearing showed that respondent made some efforts aimed at reuniting with her children. She completed the majority of her drug tests, had successful visitations with L.L., and attended counseling services throughout the entire nine-month period. However, despite making some forward movement, respondent remained stagnant in certain fundamental areas. Although she attended regular counseling sessions, she failed to demonstrate development in her emotional control and had regular combative interactions with agency workers and an alleged physical altercation with her son during the nine-month period. She rarely took responsibility for her actions, instead denying that she abused her children and also, alternatively, blaming her son for the abuse, for the case coming into care, and for her unauthorized visits to his foster home. She demonstrated a repeated disregard for her children's well-being by deliberately violating visitation restrictions put in place for their benefit, allegedly physically and verbally abusing J.L., and forcing both children to lie to agency workers on her behalf. In short, although respondent completed certain requirements of her service plan on paper, she failed to meaningfully alter the behavior that resulted in her children being taken into care. This does not show reasonable progress. See *Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 56-57 (the trial court's finding that a parent was unfit for failing to make reasonable progress was not against the manifest weight of the evidence where the parent superficially complied with service directives but did not apply what he learned to change his behavior).

¶ 27    We give great deference to the unfitness finding of the trial court. *In re J.T.C.*, 273 Ill. App. 3d 193, 197 (1995). The evidence showed that, rather than addressing the behavior that brought her children into care, respondent avoided responsibility and continued to act in ways that were not in the best interest of her children. Because of this, the court could not have returned L.L. to respondent in the near future. We therefore do not find the trial court's conclusion that respondent failed to make reasonable progress in the relevant nine-month period to be against the manifest weight of the evidence.

¶ 28                               III. CONCLUSION

¶ 29    For the reasons stated, we affirm the trial court's judgment.

¶ 30    Affirmed.