2024 IL App (4th) 241074-U

NOS. 4-24-1074, 4-24-1075 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 23, 2024
Carla Bender
4th District Appellate
Court, IL

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* M.F. and E.S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | Nos. 22JA26 |
| v. | ) | 23JA30 |
| Christian F., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | John Brian Goldrick, |
| | | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's judgment terminating respondent's parental rights, as the court did not err in finding that (1) respondent was unfit and (2) termination was in the best interest of the minors.

¶ 2    Respondent, Christian F., appeals from the trial court's judgment finding her unfit and terminating her parental rights to two of her minor children, M.F. (born in 2020) and E.S. (born in 2023). For the reasons that follow, we affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4                                A. M.F.

¶ 5    On March 30, 2022, the State filed a neglect petition as to M.F., who was two years old. The petition alleged that M.F. was neglected because her environment was injurious to her welfare (705 ILCS 405/2-3(b) (West 2022)) where (1) her grandmother, Erica B., had unresolved

issues of alcohol and/or substance abuse, (2) Erica B. had unresolved issues of domestic violence or anger management, (3) Erica B. allowed M.F. to drink an alcoholic beverage, (4) respondent allowed Erica B. to care for M.F. while a no-contact order was in place between M.F. and Erica B., and (5) respondent had unresolved issues of domestic violence and/or anger management.

¶ 6 At a shelter care hearing on March 30, 2022, the State made the following proffer. Erica was arrested for child endangerment on March 3, 2022, for allowing M.F. to drink a margarita at a restaurant. A no-contact order between M.F. and Erica was entered on March 4, 2022. On March 28, 2022, investigators from the Illinois Department of Children and Family Services (DCFS) went to the home and found Erica caring for M.F., despite respondent knowing about the arrest and the no-contact order. Police reports showed that Erica and respondent had histories of domestic violence and Erica had a history of methamphetamine use. The trial court found that there was probable cause to believe that M.F. was neglected and there was an immediate and urgent necessity to remove her from the home. The court appointed DCFS as the temporary custodian of M.F. and advised respondent that she was required to cooperate with DCFS and comply with the terms of the service plan.

¶ 7 The trial court held an adjudicatory hearing on May 17, 2022. Respondent admitted to the allegation that M.F.'s environment was injurious to her welfare because respondent allowed Erica to care for M.F. while the no-contact order was in place. The State dismissed the remaining allegations. After questioning respondent, the court accepted respondent's admission and adjudicated M.F. neglected.

¶ 8 The trial court held the dispositional hearing on July 5, 2022. Respondent reported that she had scheduled an assessment for anger management classes, scheduled mental health classes, and completed a substance abuse assessment. The court noted that it appreciated

respondent's attempts to engage in services but that more information and time was necessary for her to complete services. The court found respondent unfit, made M.F. a ward of the court, and granted custody and guardianship of M.F. to DCFS, with the right to place. The court established that the permanency goal would be to return home within 12 months.

¶ 9                                    B. E.S.

¶ 10          On March 10, 2023, the State filed a neglect petition as to E.S., who had recently been born. The State alleged that E.S. was living in an environment injurious to her welfare (705 ILCS 405/2-3(b) (West 2022)) where (1) respondent had unresolved issues of domestic violence and/or anger management, (2) the putative father of E.S. had unresolved issues of domestic violence and/or anger management, (3) the putative father of E.S. had unresolved issues of alcohol and/or substance abuse, and (4) respondent had not yet attained a finding of fitness in the juvenile case as to M.F.

¶ 11          The trial court held a shelter care hearing on March 14, 2023. The court found that there was probable cause to believe E.S. was neglected based on unresolved substance abuse and domestic violence, especially because respondent resided with the father of E.S. The court further found that respondent was making reasonable efforts, but the services provided "have not eliminated the need for removal of the child." The court appointed DCFS as the temporary custodian of E.S.

¶ 12          The trial court held the dispositional hearing on May 23, 2023. Respondent's counsel agreed with the State that respondent was unfit and that it was in E.S.'s best interest to make her a ward of the court and grant custody and guardianship to DCFS. The court made E.S. a ward of the court and appointed DCFS as her guardian.

¶ 13                    C. Permanency Review Hearings

¶ 14        At permanency review hearings on November 30, 2022, May 23, 2023, and October 17, 2023, the trial court found that respondent did not make reasonable progress toward a return home and remained unfit as to both minors.

¶ 15                    D. Termination Petitions and Hearing

¶ 16        On January 23, 2024, the State filed petitions to terminate respondent's parental rights in both cases. The State alleged that respondent had failed to make reasonable progress toward the return of the children in the nine-month period between April 16, 2023, and January 16, 2024, pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 17        The trial court held a termination hearing over several days, addressing both respondent's unfitness and the children's best interest. The father of E.S. had already signed consent to E.S.'s adoption by her current foster parent.

¶ 18                         1. *Unfitness*

¶ 19                    a. Service Plan Requirements and Reviews

¶ 20        Helen Steinbacher-Kemp was the caseworker assigned to the cases of M.F. and E.S. between December 2022 and January 2024. Steinbacher-Kemp testified that respondent's service plan required her to complete domestic violence classes, parenting skills training, a substance abuse assessment and treatment, and a mental health assessment and treatment, as well as to obtain stable housing and employment. Steinbacher-Kemp prepared two service plan reviews on March 6, 2023, and September 6, 2023. Respondent was rated unsatisfactory as to all goals except cooperation in the first review and was rated unsatisfactory for all goals in the second.

¶ 21        Steinbacher-Kemp stated that she discussed with respondent the reasons that M.F.

- 4 -

and E.S. were brought into care, but respondent "struggled to take accountability for it," arguing that she had not done anything wrong and blaming her mother, Erica. However, respondent still allowed Erica to attend more than one visit with the children.

¶ 22        Respondent testified that she knew how to contact her caseworker and understood that she needed to complete services and tasks for her children to be returned to her.

¶ 23                                        i. *Domestic Violence*

¶ 24        Steinbacher-Kemp testified that respondent completed domestic violence treatment at Collaborative Solutions. However, respondent failed the exam on March 29, 2023. Steinbacher-Kemp testified that respondent never retook the final exam, despite repeated conversations with Steinbacher-Kemp about its importance and multiple attempts by the program to contact respondent to schedule a retake. Respondent testified that she attempted to retake the test but encountered issues with her Internet that prevented her from doing so.

¶ 25        Steinbacher-Kemp also testified that respondent failed to refrain from instances of domestic violence over the nine-month period between April 2023 and January 2024. Steinbacher-Kemp stated that respondent and the father of E.S. initially attended visits together but began attending visits separately in November 2023 due to a domestic violence incident between them. When Steinbacher-Kemp explained to respondent why the visits needed to be separate, she "was very angry," minimized the domestic violence issue, and "repeatedly told [Steinbacher-Kemp] that it was a misunderstanding between her and [E.S.'s father], despite what [Steinbacher-Kemp] had read in the police reports."

¶ 26        Respondent admitted to being involved in several domestic violence incidents. However, respondent characterized an incident between herself and E.S.'s father in November 2023 as "just an argument, false accusations." She denied slapping or pushing him, stating that she

"moved him out of the doorway and told him he wasn't going to leave because he was drunk."

¶ 27                                    ii. *Parenting Classes*

¶ 28       Steinbacher-Kemp testified that respondent had completed a parenting education course, but "it did not appear that she was grasping the concepts when she was relying heavily on television at her visits and would not accept redirection from agency staff at her visits regarding her children."

¶ 29       Respondent testified that she worked with a parenting coach, Shontelle Hunt, four or five times at Family Community Resource Center (FCRC). Hunt testified that respondent was scheduled to complete an intake on August 30, 2023, but did not attend that appointment. Hunt stated that respondent was difficult to reach, but she was finally able to contact respondent and reschedule the intake for October 18, 2023; on that day, respondent called Hunt and rescheduled it to October 25. Respondent completed the intake that day.

¶ 30       Hunt testified that respondent did not take accountability for her children coming into care; rather, respondent claimed that it was because someone lied about her mother allowing M.F. to drink alcohol. Due to respondent's problems with "cognition," Hunt ordered a special curriculum for respondent, which did not arrive until December 2023. In the meantime, Hunt offered respondent help with searching for a job, attending visitation, and transportation, which respondent declined. Hunt helped respondent with housing through Bloomington Housing Authority.

¶ 31       Hunt testified that she began meeting with respondent regularly in May 2024 and noticed that respondent needed additional support to get through the parenting materials. To help respondent understand, Hunt used scenarios and repeated and broke down information so that respondent would have a better grasp of the ideas she was attempting to convey.

¶ 32                                    iii. *Visitation*

¶ 33        Steinbacher-Kemp testified that she attended respondent's visits with M.F and E.S. once a month and observed that respondent showed a lack of engagement with the children. An issue arose around appropriate food for the children; although M.F.'s doctors and therapist recommended that M.F. not consume large amounts of sugar, respondent continued to bring candy and juice to visits. When Steinbacher-Kemp addressed this with respondent, respondent "would often say that this was her child, and she knew what she was doing, and that [Steinbacher-Kemp] did not know what [she] was talking about." Respondent also struggled with a reliance on television; despite multiple conversations with Steinbacher-Kemp, Steinbacher-Kemp did not see much of a change.

¶ 34        Respondent testified that she attended visitation with her children once a month. At these visits, she played educational television shows, including some intended to teach her children Spanish. She said that the case aides sometimes redirected her to different activities. She testified that the father of E.S. bought a Spanish-language book that she had used at her visits. Respondent experienced conflicts with the case aides, especially around food, where she would bring snacks that the case aides would not allow her to give to her children. In these situations, she stated that she "got upset and mad about it" and felt that "everything gets taken away from her." She testified that the case aides told her on multiple occasions that M.F. "acted up" after eating certain foods and that sugar caused M.F. stomach issues, but respondent refused to believe that and instead believed M.F.'s behavior was caused by respondent's departure.

¶ 35                                    iv. *Employment and Housing*

¶ 36        Steinbacher-Kemp testified that respondent was unable to successfully hold a job at any point, though she did apply for a few jobs. Respondent testified that she had sporadic

employment at fast food chains; her longest period of employment was a couple of months. She was fired from one restaurant and quit from another because they "put [her] in the back, and there was just a lot of people that just spoke more of Spanish, so [she] didn't understand that much."

¶ 37    Respondent expressed that she understood that she needed to have stable housing, which meant having her own home. She lived with her boyfriend's parents, but after the house became too crowded, she moved in with her family, where she experienced difficulties with transportation from there to her classes. Respondent reported that she was trying to obtain her own residence by calling "the housing place" and communicating with Hunt from FCRC about applying for Section 8 housing.

¶ 38                              v. *Substance Abuse*

¶ 39    Steinbacher-Kemp testified that respondent did not complete regular drug screens. Steinbacher-Kemp stated that parents are usually required to test weekly; however, in the nine-month period between April 2023 and January 2024, respondent tested only three times. Steinbacher-Kemp explained that she routinely provided respondent with bus passes to attend her drug screens; this pass was active at the time that she missed most of her screens, and "less than a handful of screens" were excused because respondent's bus pass had expired.

¶ 40    Respondent completed two substance abuse assessments. The first assessment recommended level two outpatient substance abuse treatment, which respondent did not complete. The second assessment, completed between March and September 2023, did not recommend treatment.

¶ 41    Respondent testified that she believed she was expected to submit to random drug screens because her caseworkers mistook her for a drug addict due to her "mom's situation." However, she stated that she did not understand why she needed to screen if she did not smoke or

drink and if her second substance abuse assessment did not require her to obtain treatment. She also stated that she had difficulty with transportation to her drug screens and felt that her caseworker never promptly notified her about when she needed to complete a drug screen. She testified that when her caseworker notified her that she needed to screen, she would take the bus there.

¶ 42                                    vi. *Mental Health Treatment*

¶ 43            Steinbacher-Kemp testified that respondent attended her mental health treatment on a "fairly regular basis," but her provider reported to Steinbacher-Kemp that respondent experienced significant mental health issues and "continued to struggle with taking accountability for the actions that led to the case opening." Respondent testified that her counselor had discussed communication skills with her and directed her to talk to her caseworkers if she had problems.

¶ 44            Respondent testified that she discussed with her counselor the reason that M.F. was not allowed to have contact with Erica. However, when asked about this at the hearing, respondent continued to deny that Erica ever gave M.F. alcohol and called the events of that day "false accusations." Respondent maintained that she did not deserve to lose custody of M.F. She admitted that Erica had bipolar disorder, schizophrenia, anger issues, and substance abuse issues. Respondent testified that she saw no problems with Erica watching M.F. and asserted that M.F. was not affected by the domestic violence that occurred in Erica's house between Erica and respondent.

¶ 45                        b. Psychological Evaluation of Respondent

¶ 46            Dr. Judy Osgood, an expert in psychology, conducted a psychological evaluation of respondent in September 2022, which was admitted without objection into the record. Dr. Osgood testified that she diagnosed respondent with an intellectual disability, adjustment disorder

with mixed disturbance of emotions and conduct, adult antisocial behavior, and parent relational problems. Respondent's full-scale IQ was 66, while her verbal processing IQ was 68, which "is extremely low at the two percent of her age group." Dr. Osgood testified that respondent's

> "verbal comprehension deficits were very consistent with her difficulty making progress in treatment and services, her difficulty apparently understanding what was needed for her to be able to make progress in treatment and services, her apparent inability and failure to understand the risks that her child was presenting and experienced with her mother and her regarding the domestic violence, substance abuse issues."

Dr. Osgood noted that respondent had never lived independently.

¶ 47        Dr. Osgood testified that at the time of the evaluation in September 2022, she believed that respondent "did not have the ability to safely and responsibly parent her daughter." Dr. Osgood was concerned with respondent's "continued lack of progress, her continued denial of needing services, her apparent inability to really understand the risks that she presented to the child with the domestic violence between her and her mother, her mother's *** substance abuse." Dr. Osgood opined that respondent's intellectual disability meant that she would be unable to benefit from services or independently parent her children. She added that anyone with an IQ at respondent's level would need a significant amount of assistance to parent, to the point that "someone else is assuming responsibility for the primary caregiving to make sure that this child is safe and taken care of." Dr. Osgood stated that without such assistance, she would be concerned about the safety of the child.

¶ 48        Dr. Osgood said that there were services available for people with intellectual disabilities and the lack of such services could be a factor in someone's ability to complete other

services. However, she testified that respondent specifically denied that she needed services, which "makes it really challenging for trying to help a client who denies they need it." She stressed that willingness to accept the need for assistance was critical.

¶ 49       Steinbacher-Kemp testified that although Dr. Osgood's report recommended referrals for developmental disabilities, life skills, and adult education, these services were not provided to respondent by DCFS during the relevant nine-month period. Steinbacher-Kemp acknowledged that the evaluation showed that respondent had an intellectual disability, but that respondent's personality and stubbornness also contributed to difficulty communicating with her. Steinbacher-Kemp noted respondent's pushback to simple directives, such as refraining from giving M.F. candy.

¶ 50       When asked about the psychological evaluation completed by Dr. Osgood, respondent testified that she had a migraine at the time of the testing, which made the testing more difficult. She maintained that she was not disabled, despite Dr. Osgood's diagnosis.

¶ 51                          c. Trial Court's Unfitness Findings

¶ 52       The trial court found that respondent was unfit because she failed to make reasonable progress toward the return of both children during the nine-month period between April 2023 and January 2024. The court noted that respondent completed drug screens only three times in nine months, despite it being a simple task and being provided with bus passes, because respondent did not think she needed to screen. The court further noted that respondent "would not follow some simple directives regarding visitation," and while she was physically present, her reliance on television meant "not enough interaction and engagement with the children." The court stated that while respondent attended parenting classes, any lessons learned did not translate to visitation. Even when provided with one-on-one counseling through FCRC, respondent failed to

attend her first appointment, took two months to reschedule it, and turned down additional services offered to her. The court noted that this was "not cooperation with the service plan" or the court's directives. Respondent likewise never rescheduled the domestic violence exam, despite being given reasonable accommodations to do so. The court emphasized that respondent "doesn't think there's a reason why the children should be in care, she doesn't think she needs to do services, doesn't understand why she's here." The court summarized that "there is no service for a lack of cooperation, and that's what's critical in this case."

¶ 53                                    2. *Best Interest*

¶ 54         At the best interest section of the hearing, the State called Jillian K., the foster parent of M.F. and E.S. Jillian testified that she lived with her sister, her sister's husband, and their three children, who welcomed M.F. and E.S. with open arms. She and the girls lived in the basement, which had a living room, play area, two bedrooms, and a bathroom, while the rest of her family lived upstairs. She stated that M.F. was two years old when she came into her care and was very delayed at that time, as she said few words and "was testing below a one-year-old." M.F. was enrolled in early intervention services; after a year, she was hitting all of her milestones. Jillian testified that her bond with M.F. and E.S. was "very strong," as they were excited to see her and trusted her to meet their needs. She stated that both girls "really thrive on routine and consistency." She intended to adopt both girls and had signed the commitment forms. She believed that it would be in the girls' best interest to remain in her home and that she would have concerns about their well-being if they were returned to respondent.

¶ 55         On cross-examination, Jillian admitted that she did not have a Hispanic background, but she stated that she was taking steps to preserve the children's Hispanic identity by teaching them Spanish and getting input from her Hispanic friends about Hispanic heritage and

traditions. She also testified that she had tried to communicate with respondent in the past through messages and video calls, but it was ultimately not successful because respondent "has been very argumentative and antagonistic."

¶ 56    Respondent testified on her own behalf. She reiterated her previous testimony that "it's not true, the reason why [the children] got removed out of [her] mom's home," and she "believe[d] that [Erica] is a very great grandmother to [M.F.], and [respondent] didn't see any harm towards [her] child." She stated that she was "going to get all of the services that [she] need[s] to do" and was going to obtain her GED, a job, and housing.

¶ 57    She testified that she was Hispanic, M.F.'s father was Puerto Rican, and E.S.'s father was Guatemalan. Respondent was concerned that the children were not learning anything about their heritage while in foster care.

¶ 58    Respondent stated that she wanted to introduce her children to her father, who lived in Florida and was "trying to get temporary custody of [her] kids," but her "caseworkers have been blocking him." She said that her father was "willing to help me with other classes" and that there would be a placement for her children with "a facility in a ministry that [her] dad owns." She testified that she last saw her father before M.F. was removed from her custody and that he had never met E.S. According to respondent, her father had intended to attend the hearing, but "[her] attorney said that he didn't know what was going to go on today." After respondent's testimony concluded, her counsel told the trial court that he had a discussion with respondent's father, who "decided he was not going to come up today" and "indicated he would not be available," despite counsel informing him "that he might need to testify."

¶ 59    The trial court found that it was in the best interest of M.F. and E.S. to terminate respondent's parental rights. The court emphasized that M.F. had been in care for 28 of her 54

months of life and E.S. had been in care for her entire life. The court noted that both children were too young to express their preferences. With respect to the children's background and cultural ties, the court stated that while Jillian K. is not Hispanic, she reached out to individuals with that background to teach the children. The court noted that respondent testified that she was interested in developing that heritage, "but that's only been done to the extent of having children watch movies that are in Spanish," so "there's not a lot of development on [respondent's] side as well to teach the children of that heritage." The court concluded that this factor "may lean slightly" in favor of not terminating respondent's parental rights, but it was more likely a neutral factor.

¶ 60        The trial court emphasized several factors that favored termination. As to the physical safety and welfare of the children, the court noted that respondent indicated that she was willing to provide those things, but her plans for how to do so were vague. Moreover, respondent had always been dependent on someone else for her own basic needs. In comparison, the foster placement met the children's needs. The children's identities were developing with the current placement for the last 28 months for M.F. and 16 months for E.S. The children's senses of attachment and security were being met by their current routine and structure in the foster placement. The least disruptive placement for the children was the foster placement, as respondent was "not in a position to have these children back today, nor in the immediate future," even though she undoubtedly loved her children. The court emphasized that remaining in substitute care while waiting for respondent to complete services "just prolong[ed] the children being in care" because "today I don't believe we're any closer to a return of either of these children than when we started the case." The court stated that permanence was critical for the children. The court ultimately found that all these factors established that it was in the best interest of the children to terminate respondent's parental rights.

¶ 61    This appeal followed.

¶ 62                                II. ANALYSIS

¶ 63    On appeal, respondent contends that the trial court's findings that she was unfit to parent M.F. and E.S. and that it was in the best interest of both children to terminate her parental rights were against the manifest weight of the evidence.

¶ 64                                A. Unfitness

¶ 65    The involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). Here, the trial court found that respondent was unfit because she failed to make reasonable progress toward the return of her children during the applicable nine-month period. 725 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 66    Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original). *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent fails to make reasonable progress toward the return of the child when the parent fails " 'to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). Importantly, there is "a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent and actually changing the circumstances that brought the children into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. A finding of unfitness is appropriate if "the court will not be able to return

- 15 -

the child home in the near future, despite ample time and opportunity for compliance with the court's directives." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 67 We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54.

¶ 68 In this case, the trial court's finding that respondent was unfit based on her failure to make reasonable progress toward the return of her children was not against the manifest weight of the evidence. M.F., and later E.S., came into the care of DCFS due to an environment injurious to their welfare where respondent allowed M.F. to have contact with Erica despite knowing of a no-contact order between them. During the relevant nine-month period between April 2023 and January 2024, respondent failed to complete most of the required drug screens, complete a domestic violence examination, and obtain stable employment or housing. Even though she attended parenting training and mental health treatment, she did not incorporate what she may have learned into her visitation or understand why these services were necessary. She failed to cooperate with her caseworker throughout the nine-month period and denied that she needed any services or drug screens.

¶ 69 Moreover, respondent failed to address or change the circumstances that brought the children into care during the nine-month period. It was not enough for respondent to tick the boxes of completing services if she failed to implement them to address the underlying issues. See *Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. Throughout the relevant nine-month period, which began one year after M.F. was taken into care, respondent refused to take accountability for why her children came into care. She continued to deny that Erica allowed M.F. to drink alcohol or

presented any safety concerns for M.F., despite acknowledging that Erica had mental health, domestic violence, and substance abuse issues. Respondent denied that being present during domestic violence incidents affected M.F. She also continued to have multiple domestic violence incidents and downplayed their significance when asked about them. Consequently, the children were no closer to being returned to respondent's custody in January 2024 than they were in April 2023 and could not be returned to respondent in the near future.

¶ 70 Both at trial and on appeal, respondent argued that her intellectual disability and cognitive function hindered her ability to complete and understand her services. However, as respondent acknowledges on appeal, reasonable progress is an objective standard. See *L.L.S.*, 218 Ill. App. 3d at 461. Because reasonable *progress* is an objective standard distinct from reasonable *efforts*, respondent's intellectual disability does not affect our analysis. Moreover, attributing respondent's failure to make reasonable progress to her intellectual disability removes any agency and accountability on her part.

¶ 71 Testimony from both Steinbacher-Kemp and Hunt showed that they worked with respondent individually to ensure her understanding and tailored their communication with her to her level of cognitive function by reiterating information on multiple occasions. Respondent knew how to contact her caseworker and understood she needed to complete her services for her children to be returned to her custody. If at any point she did not understand which services she needed to complete or how to complete them, it was her responsibility under the service plan to reach out to her caseworker to identify how to move forward. Instead, she continued to deny that her children needed to be removed from her care, that she needed services or drug screens, that she experienced repeated and serious issues with domestic violence, and that Erica posed safety risks to her children.

¶ 72         While it is true that Dr. Osgood testified that respondent's intellectual disability may prevent her from ever benefitting from services, that is not what the trial court relied on in making its unfitness finding. Rather, the court focused on the facts that respondent (1) did not cooperate with her service plan because she failed to attend drug screens, complete the domestic violence training exam, and obtain or accept help with obtaining employment and housing; (2) failed to implement any lessons learned in parenting training to her visits with her children and refused to follow case aides' prompts and instructions; and (3) failed to understand, accept, and correct the reasons for which her children came into care. These facts remain true regardless of respondent's intellectual disability. The court's unfitness finding is not against the manifest weight of the evidence.

¶ 73                                     B. Best Interest

¶ 74         If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. See *In re D.T.*, 212 Ill. 2d 347, 364 (2004) ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). The State has the burden of proving that termination is in the best interest of the child by a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 366.

¶ 75         When determining a minor's best interest, the trial court must consider the following factors, "in the context of the child's age and developmental needs":

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and

religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 76    The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 77    The record shows that respondent cares about her children; however, "at a best-

interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Here, the trial court rested its best interest finding on the children's need for permanence, their sense of attachments, and their physical safety and welfare. This finding was not against the manifest weight of the evidence.

¶ 78    The trial court correctly emphasized that M.F. had been in foster care for 28 out of her 54 months of life and E.S. had been in care for her entire life, so they had developed a sense of attachment, security, and familiarity with their foster parent, who provided the least disruptive placement. See 705 ILCS 405/1-3(4.05)(d) (West 2022). They were bonded with their foster parent and the other family members in the home. See 705 ILCS 405/1-3(4.05)(g) (West 2022). The children were no closer to being returned to respondent's care in January 2024 than in April 2023; as such, they deserved permanence, especially M.F., who had already been in care for two years. See 705 ILCS 405/1-3(4.05)(g) (West 2022). The children's foster parent expressed her desire to adopt the children. See 705 ILCS 405/1-3(4.05)(j) (West 2022). Though the foster parent did not share the children's Hispanic background and heritage, she was willing to take steps to connect the children to their background by teaching them Spanish and contacting Hispanic friends to teach them about Hispanic heritage and traditions. See 705 ILCS 405/1-3(4.05)(c) (West 2022). Considering that respondent's only efforts to connect the children with their heritage involved showing them educational videos in Spanish, the court reasonably determined that this factor did not outweigh the others in favor of termination.

¶ 79    Considering all these factors, it was not against the manifest weight of the evidence for the trial court to find that terminating respondent's parental rights would be in M.F.'s and E.S.'s best interest.

¶ 80                                    III. CONCLUSION

¶ 81          For the reasons stated, we affirm the trial court's judgment.

¶ 82          Affirmed.