2021 IL App (4th) 200658

NOS. 4-20-0658, 4-20-0660, 4-20-0661, 4-20-0662, 4-20-0663 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* Ta. T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | Nos. 18JA157 |
| v.      (Nos. 4-20-0660 & 4-20-0661) | ) | 18JA158 |
| Terrance T. and Tanea T., | ) | 18JA159 |
| Respondents-Appellants). | ) | |
| | ) | |
| *In re* T.T., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (Nos. 4-20-0658 & 4-20-0662) | ) | |
| Terrance T. and Tanea T., | ) | |
| Respondents-Appellants). | ) | |
| | ) | |
| | ) | |
| *In re* B.W., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, | ) | Thomas E. Little, |
| v.      (No. 4-20-0663) | ) | Judge Presiding. |
| Tanea T., | ) | |
| Respondent-Appellant). | ) | |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices DeArmond and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent Terrance T. is the father of Ta. T. (born August 2012) and T.T. (born August 2017). Respondent Tanea T. is the mother of Ta. T., T.T., and B.W. (born February 2015).

In August 2020, the trial court found both respondents were unfit parents, and in December 2020, it found termination of respondents' parental rights would be in the minor children's best interests. Respondents appeal, arguing that the court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm.

¶ 2                              I. BACKGROUND

¶ 3                            A. Procedural History

¶ 4        In July 2018, the State filed separate petitions for adjudication of wardship, alleging, in relevant part, that Ta. T., T.T., and B.W. were neglected due to their being minors whose environment was injurious to their welfare when in the care of respondents because that environment exposed the minors to domestic violence. See 705 ILCS 405/2-3(1)(b) (West 2018). That same day, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 5        In October 2018, the trial court conducted an adjudicatory hearing at which both respondents stipulated that domestic violence occurred in the presence of the children. The court found that Ta. T., T.T., and B.W. were neglected minors and ordered a dispositional hearing to be conducted immediately. At that dispositional hearing, the court entered a written order finding that it was in the best interest of Ta. T., T.T., B.W., and the public that the minor children be made wards of the court and adjudicated neglected minors. The court further found (1) respondents unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors and (2) it would be contrary to the minors' health, safety, and best interest to be in their custody. The court placed guardianship and custody with the

guardianship administrator of DCFS. The written order further admonished respondents that they were required to cooperate with DCFS and "comply with the terms of the service plan and correct the conditions that require the minor[s] to be in the care [*sic*] or they risk termination of their parental rights."

¶ 6                                B. The Termination Hearings

¶ 7            In February 2020, the State filed petitions in each case to terminate respondents' parental rights. The State alleged respondents were unfit parents because they failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) make reasonable efforts to correct the conditions that were the bases for the removal of the children during any nine-month period following the adjudication of neglect; and (3) make reasonable progress toward the return of the children within the nine-month periods of October 2018 to July 2019 and April 2019 to January 2020. See 750 ILCS 50/1(D)(b), (D)(m)(i)-(ii) (West 2018).

¶ 8                                1. *The Fitness Proceedings*

¶ 9            In August 2020, the trial court conducted the fitness portion of the termination hearing.

¶ 10                            a. Testimony About Terrance T.

¶ 11                        i. *The State's Evidence: Shimeka Foster*

¶ 12            Shimeka Foster testified that she was the caseworker on the case for Webster Cantrell Youth Advocacy beginning in July 2019. Foster testified that the children came into care because Terrance had a domestic violence incident with his paramour while the children were present. Terrance was recommended for the following services: (1) parenting, (2) substance abuse and mental health assessment, (3) domestic violence, (4) housing, (5) employment, (6) visitation, (7) cooperation, and (8) anger management.

¶ 13    Foster testified that Terrance completed the mental health and substance abuse assessments with no further recommendations. Terrance had stable housing and employment for the life of the case. Foster stated that Terrance completed all his services. Terrance complied with the visitation schedule until December 2019. Foster described the "most important part" of Terrance's case as follows:

> "It was mostly about his relationships. Seeing that the reason why the case came in was because of a domestic [violence incident] between him and another parent and the children were with him. The agency mostly had issues with his ongoing relationship that ended in, she would file an OP [(order of protection)], and then not go, file another OP then not go. We just had another DCFS investigation where they called and said that he was involved in another—with another lady so it's mostly because of the characters [*sic*] of his relationships."

¶ 14    Foster explained that although Terrance had technically completed his domestic violence and anger management services, he did not "successfully" complete them because he had not absorbed or implemented any of the lessons from those services. Instead, "it's like [his behaviors] never stopped. It just kept going even after the finishing and completion of the services." Foster opined that it was not safe to return the children to his care and it would still not be safe if Terrance were given another six to nine months. Foster acknowledged that Terrance had completed all of his services and had his home prepared for the children to return home. Foster stated the following:

> "But every time it seemed like I would get to that point something else would happen. The last time I saw him in December, I went through the new house and looked at everything. It was perfect for the kids. Then I get to the office and find

out he has a warrant for meth[amphetamine] delivery. I'm like it's just—it's always something *** stopping me from sending those children home."

¶ 15 Foster stated that Terrance did not understand why the agency had "the issue of sending the children home with him."

"[W]e're telling him, hey, this relationship it can't happen. This is the reason why your children came into care. We have to make sure that they are in a safe environment away from domestic violence, away from drugs, away from anything that would cause them to be unsafe. He didn't understand that."

Foster further stated, "It's been over a year. There have been numerous, numerous times where I have sat down and, like, hey, this is what you need to do. *** Making sure that you change the characteristics that brought your children into care [in] the first place and nothing has changed."

¶ 16 On cross-examination, Foster acknowledged that Terrance had completed every service recommended, including a 25-week class on partner abuse. However, Foster explained that merely completing the classes was not as important as absorbing the information and making demonstrable changes. Foster agreed that Terrance completed most of his services in March 2019 and that the reports from his domestic violence services indicated that he had (1) admitted his past domestic violence, (2) acknowledged how he negatively impacted his partners, and (3) had no issues for 25 weeks.

¶ 17 Foster stated that the visits had gone well, although she placed them on hold in February 2020. Foster agreed Terrance had no pending domestic violence cases that she was aware of, though "he [was] fighting a meth delivery charge," and DCFS had recently sent Foster a domestic violence incident report. Foster stated that she did not think the children could be returned home within the next nine months because Terrance's behavior had been unchanged for the two

years the case had been open and the children needed stability.

¶ 18 Foster explained that Terrance had three separate cases at DCFS and she could not get much information from anyone inside the agency about Terrance. Foster was the only one who spoke with Terrance. Foster stated that she was prepared to send the children home but the other caseworkers for his other cases "were seeing something different." Foster stated she was trying to sort out the difference in perspective and spoke with Terrance about DCFS's concerns as a whole. Specifically, she told Terrance that "they're looking at your relationships still with the person that you have altercation[s] with to bring your children into care. That was an issue throughout the majority of the case." Foster stated that when that relationship ended, the methamphetamine charge was discovered, and shortly after that, DCFS provided her with another report of a domestic violence incident with another girlfriend. Foster concluded, "[W]e have to look at all—every piece of the puzzle not just if he finishes his services[,] but if it's ongoing." Foster stated that her opinion was based on the other cases as well as what she had observed in the instant case.

¶ 19 Foster opined that after Terrance completed his services, he did not "look like he was incorporating what should have been taught or learned at those lessons into his lifestyle." The State did not present further evidence.

¶ 20 ii. *Testimony of Terrance T.*

¶ 21 Terrance testified that he had been in communication with Foster throughout the life of the case and had completed all the recommendations in the service plan. Terrance also had stable housing and employment. Terrance addressed the allegations of domestic violence by stating that the three different mothers of his children had been calling him to make the other women mad or to get him in trouble. Terrance accused the women of lying and denied having an intimate relationship with any of them.

¶ 22　　　　　Terrance testified that he did not have any pending domestic violence cases, his home was safe, and he was willing to complete any further services that DCFS wanted. Terrance admitted that he had "some rather serious pending legal issues" with the possibility of prison time and it would be harmful to his children if they returned home to him and had to be removed later.

¶ 23　　　　　When asked if he wanted to say anything further, Terrance testified as follows:

> "Just I've done everything, I mean, I tried to do whatever it is to take. I'm not responsible for what the mothers are doing and not doing. The deviousness that's going on, the false calls because they have caught them lying but they call in several different times, like, I'm not responsible for that. I've done what they asked me to do, and I'm just trying to get my kids. It's been two years now. ***
>
> *** I mean, whatever it takes to do for my kids, that's what I'm going to end up doing. I have been here showing up for the last two years. Whatever they ask of me I will do it with no hesitation, no questions, whatever it take [*sic*] for my kids I'm willing to do."

¶ 24　　　　　　　　　　　b. Testimony About Tanea T.

¶ 25　　　　　Foster testified that Tanea was recommended to complete services for (1) parenting, (2) substance abuse, (3) mental health, (4) domestic violence, (5) housing, and (6) cooperation. Tanea completed mental health and substance abuse assessments with no recommendations. Tanea also attended some parenting classes but did not complete the service. Foster testified that Tanea had not completed any of her services and would start them when prompted but then drop out. Foster further stated that at meetings, she would repeatedly explain the necessary services and what steps were required. Tanea would say she was going to engage in services, but Foster reported nothing had changed. Tanea had sporadic visitation with the children,

and those visitations generally went well.

¶ 26    On cross-examination, Foster acknowledged that Tanea had attended parenting classes but was confused because they mostly concerned substance abuse. Foster referred Tanea to a different provider where Tanea attended five classes before she stopped. Foster stated she was unaware that Tanea attempted to enroll with a domestic violence service provider but that provider refused to accept her. When Foster contacted that provider, the provider stated Tanea had not come. Foster acknowledged that she never referred Tanea to a different provider because Foster was never made aware that Tanea had been turned away. However, on redirect examination, Foster stated she subsequently referred Tanea to a different domestic service provider and Tanea started services with that provider but did not finish.

¶ 27    Tanea did not present any evidence.

¶ 28                        c. The Trial Court's Findings

¶ 29    The trial court found that the State had proved all three allegations of unfitness listed in the petition—that is, that respondents failed to (1) maintain a reasonable degree of interest, (2) make reasonable efforts, and (3) make reasonable progress—by clear and convincing evidence. Regarding Tanea, the court noted that although she started some services, she never completed any.

¶ 30    Regarding Terrance, the trial court stated it (1) had listened closely to the testimony, (2) found Foster's testimony "was credible and persuasive," and (3) emphasized that "one of the most helpful things" was Foster's statements that Terrance had not shown "any incorporation of the information he should have learned into his lifestyle and there were ongoing problems here." The court repeatedly noted that although Terrance had completed his services in the sense that he attended all of the required programs, Terrance had not "successfully completed the services"

because of a failure to apply what he had learned into his everyday activities. The court also noted that Foster did not believe the children could be returned home within six to nine months because "after all this time nothing has really changed and the behaviors have not changed." Finally, the court noted that Terrance had ongoing issues with relationships and serial orders of protection. Accordingly, the court found respondents were unfit parents in each individual case.

¶ 31                    2. *The Best-Interest Proceedings*

¶ 32        In December 2020, the trial court conducted proceedings regarding whether it was in Ta. T., T.T., and B.W.'s best interest to terminate respondents' parental rights. Foster testified that Ta. T. and T.T. were placed together in a traditional foster home, while B.W. was placed in a different traditional foster home. Both homes were adoptive placements. The children had been in those homes for over two years, and they were loved, cared for, and had stability. The foster parents (1) communicated with each other, (2) had sibling visits, and (3) if a parent reached out, permitted the parent to visit or speak with the children on the phone.

¶ 33        Ta. T. and T.T. were thriving in their placement and got along very well with the foster parents' biological child. B.W. was the only young child at his placement. Although B.W.'s foster parents had two older sons, one was out of the home and both "treat [B.W.] just like they're *** he's [their] little brother." All three children were (1) integrated into their foster families, (2) developmentally on target, (3) integrated into the community, and (4) had their medical, emotional, and educational needs met. Foster stated the children were very bonded to their respective foster parents.

¶ 34        On cross-examination, Foster confirmed that the children had always been in their current placements throughout the life of the case and were never moved. Foster stated she observed visitation with Terrance and "[h]is visits go great." Foster stated that the children loved

Terrance and he loved the children; Foster never saw a problem during visits.

¶ 35 Foster acknowledged that in November and December 2019, she was planning on returning the children to Terrance. Foster inspected Terrance's home, which was clean, safe, and had everything the children needed, but she changed the plan when Terrance was charged with methamphetamine delivery. Foster further noted that (1) the methamphetamine charge remained unresolved, creating uncertainty, (2) she began receiving reports of domestic violence, and (3) Terrance had a pending investigation for domestic violence from earlier in the year and was arrested for domestic violence in November 2020. Foster explained that these events, taken together, indicated to her that Terrance's behavior had not changed and the children could not return safely.

¶ 36 Tanea testified that she loved her children and had recently seen them a few days before Christmas. Her visits went smoothly until the end, when the children would start asking to come home with her. Tanea believed it was in the children's best interests to return to her because, if they were adopted, they would live in separate homes and rarely see each other, whereas she could care for all of them together. Tanea stated she was now engaging in all her classes and was finally getting her life back together. She knew her children still loved her and believed "the best interest is for all of them to be together and raised together at home with their mother."

¶ 37 Terrance testified that he had been consistently involved in the case from the beginning. He completed all his services, had stable housing, and had full-time employment for the duration of the case. Visits with his children went very well; they read together, wrote, and drew pictures.

¶ 38 Terrance explained that he was told in December 2019 that his children were returning home. Three days later, he got a call from Foster saying there was a pending

methamphetamine case and that when Terrance got that "taken care of," they would pick back up where they left off and continue. Terrance was extremely surprised when the goal got changed to termination because he had always done everything he was asked to do. Terrance had no convictions in the past year, though the methamphetamine case was not resolved.

¶ 39 When asked if he wanted the trial court to know anything else, Terrance said the following:

"I have been here fighting for these kids since day one. Everything that was told to me that I needed to do, get, or had to get, or get done, it got done. ***

*** [T]here's no better place for my kids to be than at home. I take great care of my kids. I work every day. I got a nice home for them. I raise them.

My kids did not go into these people['s] houses not respectful or not learning, not smart, like, my kids have always been smart. My kids have always been respectful. They have always been like just—just great joy. And I just feel like the best thing for my kids would be to be at home with their parents not in no [*sic*] traditional care."

¶ 40 The trial court found that it was in the minor children's best interests to terminate respondents' parental rights. The court began by stating the following:

"For purposes of our oral record, the focus of our hearing today is not on whether the parents are fit or unfit, that has already been decided by the Court at an earlier hearing. Instead, the focus today is on what is in the best interest of the children.

***

I've considered all the factors set forth in [section 1-3 of the Juvenile Court Act of 1987 (705 ILCS 405/1-3 (West 2018))], but the ones I believe are most

applicable to this case include the children's sense of attachment, where they have a sense of security, a sense of familiarity, a sense of continuity, and the least disruptive placement alternative for the children. An additional factor that I think is especially applicable to this case would be their need for permanence including the need for stability and continuity of relationships with parent figures, with siblings, and other relatives."

The court continued, stating:

"all three of these children are in desperate need of stability and consistency. At this time, the biological parents have not shown that they are able to provide a stable and protected environment. They have not shown any interest in changing their lifestyle to get their children home with them."

¶ 41 The trial court found the State's evidence credible and noted that the foster parents had provided for all the physical and emotional needs of the children, including stability, permanency, and normalcy. The children were in adoptive placements and had been in those placements for two years. Accordingly, the children were very bonded to their foster parents. The court also noted that the children were integrated into the families and yet maintained contact with each other because the foster parents had frequent sibling visits. As a result, the court found it was in the minor children's best interests to terminate respondents' parental rights in each case.

¶ 42 Respondents appealed, and this court consolidated the cases on appeal for consideration.

¶ 43 II. ANALYSIS

¶ 44 On appeal, respondents argue that the trial court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We

disagree and affirm.

¶ 45                                A. The Fitness Determinations

¶ 46        Respondents argue the trial court's findings that the State proved all three grounds of unfitness by clear and convincing evidence in each case were against the manifest weight of the evidence. Although it appears Terrance may very well have a strong argument as to reasonable interest and reasonable efforts, it is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's findings that respondents failed to make reasonable progress within the applicable nine-month period were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 47                                1. *The Standard of Review*

¶ 48        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 49                                2. *The Law Regarding Reasonable Progress*

¶ 50        The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) by clear and convincing evidence. *N.G.*, 2018 IL 121939, ¶ 28. Section

1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2018). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157 N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 51    Likewise, this court has defined "reasonable progress" as follows:

" 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 52              3. *The Trial Court's Finding in This Case*

¶ 53    Here, the State presented evidence that Tanea failed to complete any of her services. In particular, she failed to complete parenting and domestic violence services. Tanea also failed to

maintain stable housing and sporadically attended visits. The trial court's findings that Tanea failed to make reasonable progress were well supported by the evidence.

¶ 54    Regarding Terrance, as the trial court noted, "[i]t's an interesting case" because he attended all of his required services. On paper, Terrance had fully complied with the service plan by the middle of 2019. Foster testified that she was close to returning the children to his care and even had a plan in place to do just that in December 2019 when she discovered he had been charged with delivery of methamphetamine. Tellingly, Foster stated that even though Terrance had three cases with DCFS, she was the only caseworker who thought the children could be returned home. Foster explained that, throughout the life of the case, Terrance had repeated incident reports for domestic violence with different women, and his paramour—the same woman present during the domestic violence incident that caused the children to enter care—filed for orders of protection multiple times. Foster stated, "He is the one person that's connected to all of it." Foster wanted to make sure she knew what was and was not happening and that Terrance knew what he had to do. But the undisclosed methamphetamine charge and subsequent domestic violence incident with yet another woman made Foster realize that, despite his ostensible completion of services, Terrance was not behaving any differently than when the children first came into care.

¶ 55    Ultimately, the trial court's ability to return the children to a parent's care in the near future is the lodestar of whether a parent has made reasonable progress. Although the court is focusing on the parent's conduct and whether the parent is "unfit" as defined by the Adoption Act, the parent's progress is always measured against (1) the conditions that brought the child into care and (2) other conditions subsequently discovered that prevent the child from returning to the parent's custody. *C.N.*, 196 Ill. 2d at 216-17. Long ago, this court described reasonable progress in terms of a parent's compliance with directives that is "sufficiently *demonstrable* and of such a

*quality*" that the child will soon be able to return home. (Emphases added.) *L.L.S.*, 218 Ill. App. 3d at 461. A trial court should not return a child to a parent's custody if the conditions are unsafe. And when the State is able to prove, by clear and convincing evidence, that the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives, then a finding of unfitness is appropriate.

¶ 56    In this case, the clear focus of the trial court's reasoning was that there was a significant difference between going through the motions, checking off the boxes, mechanically doing what is asked of the parent, and actually changing the circumstances that brought the children into care. The point of requiring parents to attend classes and engage in services is not just so the parents can say they attended; it is so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe in their care. Notwithstanding Terrance's success on paper, the evidence accepted by the court demonstrated that his progress was not demonstrable or of such a quality that (1) the conditions that brought the children into care had been corrected and (2) the children could be returned home safely.

¶ 57    Again and again, Foster testified that Terrance's behavior was unchanged since the children had come into care, despite his completing the recommended services. Terrance testified he had done everything asked of him and the ongoing domestic violence allegations against him were untrue. We find it particularly notable that the trial court stated, "[L]istening closely to the testimony[,] I do find that the testimony of Ms. Foster I find was credible and persuasive." The trial court is in the best position to view and evaluate the parties and determine credibility. We are especially deferential when, as here, the court makes an explicit credibility finding after hearing conflicting testimony. See *People v. Hadden*, 2015 IL App (4th) 140226, ¶¶ 28-29, 44 N.E.3d 681 (explaining the importance of paralanguage when evaluating oral testimony). By finding Foster

- 16 -

credible, the court was rejecting Terrance's version of events and agreeing with Foster's conclusion that Terrance's completion of services was superficial, merely ticking items off of a list instead of demonstrable progress towards correcting the conditions that brought the children into care. Accordingly, we conclude that the trial court's finding that Terrance failed to make reasonable progress was not against the manifest weight of the evidence.

¶ 58    In reaching this conclusion, we do not mean to disparage Terrance's efforts. The case was opened in July 2018, and Terrance completed nearly all his services by March 2019, four months prior to the expiration of the first nine-month period. And he completed his final service in June 2019, still well within the time frame. The uncontroverted evidence showed that Terrance consistently stayed in contact with the caseworker and diligently attended every service requested of him, including additional services subsequently added by DCFS, such as anger management.

¶ 59    As we stated earlier, Terrance performed, on paper, exactly as we would hope and expect every parent who wants to be reunited with his children to perform. Terrance's case is unusual in that most parents struggle to complete services at all, much less to complete them in a timely manner. Attendance can be half the battle, and Terrance should be commended for his diligent efforts.

¶ 60    Nonetheless, mere attendance is not enough. Issues such as substance abuse, mental health, and domestic violence can be persistent and require continuing efforts. Much like a parent who maintains sobriety only when engaged in inpatient treatment, Terrance's staying out of trouble while engaged in services, although commendable, was not sufficient to ensure the safety of the children.

¶ 61    Before concluding, we emphasize that this case is quite exceptional, if not unique. However, that is not surprising. It is rare that a parent who completes his or her service plan would

be deemed unfit.

¶ 62                    B. The Best-Interest Determinations

¶ 63                    1. *The Applicable Law and Standard of Review*

¶ 64          At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interests. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 65          A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.*

¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 66                                    2. *This Case*

¶ 67          The trial court noted that (1) permanency, (2) the need for stability, and (3) attachment in relationships were paramount in its decision making. The children had spent over two years in their current placements, and the foster parents provided for them day after day. The foster parents were willing to adopt, and they had a strong connection with the minor children. The children were fully integrated into their respective foster families, and all their needs were being met. Finally, the court noted that the foster parents were facilitating contact between the children. Accordingly, we conclude the trial court's findings that it was in the minor children's best interests to terminate respondents' parental rights in each case were not against the manifest weight of the evidence.

¶ 68          We thank the trial court for its thoughtful analysis in this case regarding reasonable progress, which this court found particularly helpful.

¶ 69                                    III. CONCLUSION

¶ 70          For the reasons stated, we affirm the trial court's judgments.

¶ 71          Affirmed.

No. 4-20-0658

| | |
|---|---|
| **Cite as:** | *In re Ta. T*, 2021 IL App (4th) 200658 |
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, Nos. 18-JA-157, 18-JA-158, 18-JA-159; the Hon. Thomas E Little, Judge, presiding. |
| **Attorneys for Appellant:** | Monica Hawkins, of Hawkins, Amero & Root, P.C., of Decatur, for appellants. |
| **Attorneys for Appellee:** | Scott Reuter, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |