NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241287-U

NOS. 4-24-1287, 4-24-1288 cons.

IN THE APPELLATE COURT

FILED
January 28, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* Ev. H. and Ei. H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|       Petitioner-Appellee, | ) | Nos. 22JA21 |
|       v. | ) |      22JA22 |
| Autumn M., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's judgment terminating respondent's parental rights, as the court did not err in finding that respondent was unfit because she failed to make reasonable progress toward the return of her minor children.

¶ 2    Respondent, Autumn M., appeals from the trial court's judgment finding her unfit and terminating her parental rights to two of her minor children, Ev. H. (born in 2017) and Ei. H. (born in 2019). For the reasons that follow, we affirm the court's judgment.

¶ 3                        I. BACKGROUND

¶ 4    On September 28, 2021, respondent was arrested on a charge of domestic battery for striking Ev. H. multiple times on her buttocks and face. An intact family services case was opened on October 10, 2021, involving respondent and both children. On March 31, 2022, the State filed a petition for adjudication of wardship of both children pursuant to section 2-3(1)(b) of

the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)), alleging that they were neglected and/or abused because their environment was injurious to their health and well-being. The State then filed a motion for the children to be placed in shelter care on May 10, 2022. The trial court denied the motion on May 11, 2022, finding that there was no immediate and urgent necessity to remove the minors from their home.

¶ 5        The trial court held the adjudicatory hearing on the State's petition for adjudication of wardship on June 10, 2022. The State called three witnesses: Dennis Woodworth, who witnessed the incident on September 28, 2021; Jake McMahon, a sergeant with the Adams County Sheriff's Office who assisted with respondent's interview and arrest on that day; and Brittany Lamberson, respondent's caseworker from Catholic Charities. Based on their testimony, the court found that the State proved by a preponderance of the evidence that respondent used excessive corporal punishment when she struck Ev. H. several times on September 28, 2021. The court then found that Ev. H. was physically abused (705 ILCS 405/2-3(2)(i) (West 2022)) and Ei. H. was at substantial risk of physical abuse (705 ILCS 405/2-3(2)(ii) (West 2022)).

¶ 6        The trial court proceeded to a dispositional hearing on July 26, 2022. The court adjudicated the minors abused pursuant to the Juvenile Court Act, made the minors wards of the court, granted guardianship of the minors to the Illinois Department of Children and Family Services (DCFS), granted physical custody of the minors to respondent, and set a permanency goal of remaining at home.

¶ 7        The State filed an amended petition for adjudication of wardship on August 11, 2022, having again taken the minors into protective custody. The State added allegations that (1) respondent was observed threatening and yelling at Ei. H. on August 7, 2022, and (2) after protective custody was taken, Ei. H. informed investigators that respondent inflicted the bruise

present on her right arm. At the resulting shelter care hearing, Julie Jones, a child protection investigator with DCFS, testified that DCFS received a call on August 7, 2022, that Ei. H. was transported from Blessing Hospital to St. Louis Cardinal Glennon Children's Hospital for respiratory concerns, where respondent was observed and reported by hospital staff to be violent and threatening toward Ei. H. As a result, DCFS took protective custody of Ei. H. on August 9, 2022. Respondent informed the trial court that she did not cause the bruise on Ei. H.'s arm, but that it was caused by Ei. H. ripping her intravenous tube from her arm. The court found that there was probable cause that the State's allegations in the amended petition were true, and it was a matter of immediate and urgent necessity to remove the minors from the home. The court entered an order placing the minors temporarily in shelter care with DCFS. The minors were placed with their paternal grandmother.

¶ 8        The trial court held an adjudicatory hearing on the amended petition on October 12, 2022, and a dispositional hearing on November 28, 2022. On the State's request and without objection, the court admitted an exhibit of respondent's guilty plea and sentence for battery for striking Ev. H. in September 2021. At the conclusion of the dispositional hearing, the court again adjudicated the minors neglected and abused pursuant to the Juvenile Court Act, made the minors wards of the court, and granted custody and guardianship of the minors to DCFS, with authority to place the minors. The court set the permanency goal to return home within 12 months. Furthermore, based on a report that respondent's visits with the minors were predominantly negative experiences for the minors, with one visit ending early due to respondent threatening physical abuse to one of them, the court believed that further visits would not be in the best interest of the minors and ordered them to be suspended.

¶ 9        At five subsequent permanency hearings between March 2023 and July 2024, the

trial court ordered custody and guardianship of the minors to remain with DCFS. On July 8, 2024, on the State's request, the court changed the permanency goal to substitute care pending termination.

¶ 10     On July 15, 2024, the State filed a motion for termination of respondent's parental rights. The State alleged that respondent was an unfit parent under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)) because she failed to make reasonable progress toward the return of the minors in any nine-month period following the adjudication of neglect. The State identified three applicable nine-month periods: (1) October 12, 2022, through July 12, 2023; (2) July 12, 2023, through April 12, 2024; and (3) April 12, 2024, through the "present."

¶ 11     The trial court held a hearing on the State's motion for termination on September 26, 2024. The following evidence was presented.

¶ 12     Tiffany Baker, a child welfare specialist at DCFS, prepared several service plans for respondent, which were admitted into evidence at the hearing over respondent's objection. Baker testified that the service plan dated June 2023 encompassed January through June 2023. The service plan admitted into evidence also covered events prior to January 2023. The plan required respondent to engage in mental health counseling and services, complete parenting classes, attend visitation with the minors, and obtain housing and employment. Baker testified she rated respondent's efforts satisfactory as to cooperation, parenting, visitation, housing, and employment. She rated respondent's efforts unsatisfactory as to mental health counseling. In the service plan, Baker reported that respondent completed a substance abuse evaluation in November 2022, began seeing a mental health counselor at Blessing Physician Services monthly in May 2022 and a mental health nurse in December 2022, and completed a psychological evaluation in December 2022.

Respondent was diagnosed with bipolar disorder but did not take medications. Baker noted in the service plan that respondent was "still hesitant to fully admit the responsibility she took which lead [*sic*] to the children coming into care." Baker testified that respondent was discharged from counseling at Blessing Physician Services after missing too many appointments. Respondent testified that in June 2023, her relationship with her children was "really good."

¶ 13        Baker testified she prepared the next service plan in December 2023, which encompassed July through December 2023. She further testified she rated respondent's efforts satisfactory as to cooperation. However, she rated respondent's efforts unsatisfactory as to mental health, parenting, visitation, housing, and employment. Baker testified that during that period, respondent did not cooperate with her mental health and counseling providers, did not attend appointments regularly, and was involuntarily admitted to the psychiatric unit in November 2023. Respondent saw four different counselors over the course of the year. She had some employment in 2023, but it was not steady. Baker testified that respondent completed a parenting class around September 2023 but did not pass it. Respondent then engaged in a different parenting class but was unsuccessfully discharged from it.

¶ 14        Baker testified that respondent was sexually assaulted in August 2023 and became "angrier" and "more volatile" as a result. When respondent was called to the witness stand, respondent testified that after this event, she "thought that everybody was doing witchcraft on [her]." Respondent reported "seeing stuff" between August to November 2023.

¶ 15        After a child and family team meeting in October 2023, Baker did not meet with respondent in person again until January 2024 because Baker did not feel safe meeting with respondent alone. Baker testified that respondent's "mental health changed" and she accused Baker of practicing witchcraft. Through social media and text messages, respondent threatened Baker

and her son. Baker testified that she was unable to communicate in a rational way with respondent between October 2023 and January 2024, but Baker still maintained contact via phone. Respondent testified that Baker had blocked her number during this period.

¶ 16        Baker testified that respondent's visits with the children had been reinstated in March 2023 but were again suspended in November 2023 due to concerns that her mental health was a potential safety risk to the minors. Baker testified that DCFS did not recommend that custody be returned to respondent or that respondent have unsupervised or overnight visitation with the minors.

¶ 17        Subsequent service plans, dated June 2024 and July 2024 and encompassing December 2023 through July 2024, were also admitted at the hearing. Baker testified she rated respondent satisfactory as to cooperation, mental health, housing, and employment, but unsatisfactory as to parenting and visitation. Baker further testified that after respondent began taking medication in December 2023, she became calmer. In January 2024, respondent began seeing a counselor more regularly and obtained steady employment. Baker also testified respondent successfully completed a one-on-one parenting course in April or May 2024.

¶ 18        In the June 2024 service plan admitted into the record at the termination hearing, Baker reported that respondent used marijuana recreationally and missed two drug drops in April and June 2024. Baker also described an incident in May 2024 where respondent unintentionally saw both minors while dropping off a friend's son at the same dance studio the minors attended. Afterwards, the minors' counselor reported that both minors "displayed hyperarousal and a lot of regression" in their session, as well as "sexually reactive behavior," ignoring boundaries, and violating personal space.

¶ 19        During respondent's testimony, she stated that she took her psychiatric medication

as prescribed and had an additional as-needed anxiety medication that she did not take because it caused drowsiness. Respondent testified that she initially saw her counselor every week and later saw her every other week. Respondent stated that "a lot has changed since last year," that she was "stable now," and compared to the year before, she was a "completely different person." She also reported that she was no longer hallucinating. She requested the trial court deny the motion to terminate her parental rights because "[she] can do it" but "just need[s] a little bit more time."

¶ 20 The trial court found that the State proved by clear and convincing evidence that respondent failed to make reasonable progress toward the return of the minors within any nine-month period after adjudication. The court determined that it did not need to look beyond the first two nine-month periods alleged by the State. The court noted that during these two periods, respondent "was engaged in some services" but "was having some mental health issues and was behaving in a way that made it difficult, if not impossible for the caseworkers to communicate with her." The court stated that the services that respondent engaged in "did not cause the type of progress to occur which is contemplated by the statute."

¶ 21 The trial court then proceeded to the second part of the termination hearing to consider the best interest of the minors. Baker testified that the minors had been in their current placement since August 2022. She stated that the minors appeared bonded to their foster parents and sought them out to meet their needs. The foster parents employed age-appropriate discipline and ensured that the minors received proper education and medical treatment. Baker testified that she had no concerns with the foster placement. The foster parents signed permanency commitment paperwork and intended to adopt the minors. Baker confirmed that at no point in time had DCFS recommended that custody or guardianship be restored to respondent.

¶ 22 Baker acknowledged that respondent had adequate housing for the minors, was

employed, and that the minors would also receive Social Security death benefits after the death of their father. Respondent's only family in Illinois was her mother, who was a nurse. Baker stated that respondent consistently asked to resume her visitation and loved her children.

¶ 23 Respondent testified that she obtained housing through a Young Women's Christian Association program, which she could stay in for two or three years; afterwards, she could live with her mother. She stated that she had "a lot of family" and that her father's side of the family lived in Milwaukee, Wisconsin. She testified that she would be able to take care of her children on a day-to-day basis and loved them.

¶ 24 The trial court noted that the minors were currently ages six and four and had been in their foster placement since August 2022. The court stated that the minors were bonded to their foster parents and their needs were being met. The court acknowledged that respondent loved the minors and wanted to have contact with them. However, the court stated that there had been no evidence presented "to show when, if ever, it could be possible to consider placing one or both of the minors back with the mother." The court determined that it would not trade the certainty of permanency for the minors for the uncertainty of being placed with their mother. The court ultimately found that the State showed by a preponderance of the evidence that it would be in the best interest of the minors to terminate respondent's parental rights.

¶ 25 This appeal followed.

¶ 26                                  II. ANALYSIS

¶ 27 On appeal, respondent argues that the trial court's unfitness finding was against the manifest weight of the evidence because (1) the State did not present evidence as to the first three months of the first nine-month period and (2) respondent made reasonable progress in the latter half of the second nine-month period. Respondent does not challenge the court's finding that

- 8 -

terminating her parental rights was in the minors' best interest.

¶ 28　　　　The involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). Here, the trial court found that respondent was unfit because she failed to make reasonable progress toward the return of her children during the two nine-month periods between (1) October 12, 2022, through July 12, 2023, and (2) July 12, 2023, through April 12, 2024. See 750 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 29　　　　Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original). *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent fails to make reasonable progress toward the return of the child when the parent fails " 'to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). Importantly, there is "a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent, and actually changing the circumstances that brought the children into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. A finding of unfitness is appropriate if "the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 30　　　　We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding

is against the manifest weight of the evidence "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. Under this standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We "must not substitute [our] judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 498-99.

¶ 31        Respondent's only challenge to the trial court's finding of unfitness during the first nine-month period is that Baker did not testify to, and no admitted exhibits addressed, respondent's progress between October 12, 2022, and December 31, 2022. However, the State correctly points out that the June 2023 service plan, admitted into evidence at the termination hearing, addressed several events between October and December 2022: respondent completed a substance abuse assessment in November 2022, had been seeing a mental health counselor since May 2022, began seeing a mental health nurse in December 2022, and completed a psychological evaluation in December 2022. Respondent characterizes these events as "incidental," given Baker's testimony that this service plan encompassed January to June 2023. However, the court was not bound by Baker's description to constrict its review of this service plan to that period, as the service plan itself was admitted into evidence for the court's consideration. Respondent is thus incorrect that no evidence addressed respondent's progress between October and December 2022.

¶ 32        A review of the evidence establishes that while respondent completed a few court-ordered tasks from October to December 2022, respondent did not make reasonable progress for the remainder of the nine-month period because she was discharged from counseling for missing appointments, did not take medication for her bipolar disorder, did not have steady employment,

and still did not take responsibility for her children being in care. Respondent's visitation was furthermore suspended for four months between November 2022 and March 2023 out of concern for the minors. The trial court's finding that respondent did not make reasonable progress during the first nine-month period was therefore not against the manifest weight of the evidence.

¶ 33 Respondent next argues that the trial court's finding of unfitness during the second nine-month period, between July 2023 and April 2024, was against the weight of the evidence because respondent improved in almost every area between January and April 2024. Respondent acknowledges that she struggled with her mental health between July 2023 and January 2024. However, she contends that her lack of progress in the two areas in which she was rated unsatisfactory after January 2024—parenting and visitation—was caused only by the court's orders. While it is true that respondent was prevented from visiting her children by the court's order suspending visitation in December 2023, the State correctly points out that respondent herself caused the suspension of visitation. Notably, however, respondent does not argue on appeal that the court should have resumed visitation—rather, respondent herself admitted she needed more time to complete her services before restarting visitation.

¶ 34 The record shows that during this nine-month period, respondent did not cooperate with her mental health and counseling providers, was involuntarily admitted to the psychiatric unit, regularly missed appointments, was unsuccessfully discharged from a parenting class, did not have stable employment, reported "seeing things," accused Baker and others of performing witchcraft on her, and posted confidential information and inappropriate videos of the minors on social media. Her visitation was suspended in November 2023 and never reinstated out of concern for the minors. While respondent's mental health seemed to improve in the last few months of this nine-month period after she began regularly taking medication, respondent still had not progressed to the point

that Baker or DCFS recommended that custody be returned to respondent or that respondent have unsupervised or overnight visitation with the minors. Nor did the trial court, at either of the permanency hearings in January and March 2024, believe that respondent made sufficient progress to resume visitation.

¶ 35 The trial court was entitled to weigh this evidence accordingly, as it was in the best position to observe the conduct and demeanor of the parties and witnesses. Under a manifest weight standard of review, we will not substitute our judgment for that of the trial court. See *D.F.*, 201 Ill. 2d at 498-99. In this case, almost two years had passed since the minors were removed from respondent's custody in August 2022—almost three years since the intact case was opened in October 2021. Nevertheless, respondent was further, rather than closer, to the minors being able to return home, as the court and DCFS did not believe it was suitable for respondent to regain visitation, much less custody. While we commend respondent for making some progress beginning in January 2024, the court was correct that it would "not be able to return the child[ren] home in the near future, despite ample time and opportunity for compliance with the court's directives." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55. Thus, the court's unfitness finding was not against the manifest weight of the evidence.

¶ 36                                III. CONCLUSION

¶ 37 For the reasons stated, we affirm the trial court's judgment.

¶ 38 Affirmed.

- 12 -