NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250229-U

NOS. 4-25-0229, 4-25-0230, 4-25-0231 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 9, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.F., A.H., and N.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|       Petitioner-Appellee, | ) | Nos. 19JA240 |
|       v. | ) | 19JA241 |
| Shannon F., | ) | 19JA242 |
|       Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, holding the trial court's unfitness finding was not against the manifest weight of the evidence.

¶ 2    In November 2024, the State filed an amended petition to terminate the parental rights of respondent mother, Shannon F., to her minor children, T.F. (born in January 2013), A.H. (born in November 2015), and N.H. (born in April 2017). After conducting hearings on the petition, the trial court found Shannon to be an unfit parent under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and determined it was in the minors' best interests to terminate her parental rights. Shannon appealed, challenging only the court's unfitness finding. For the following reasons, we affirm.

¶ 3                      I. BACKGROUND

¶ 4	On August 5, 2019, the State filed a petition asserting T.F. was neglected and should be made a ward of the court because her environment was injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)). The petition alleged at least two incidents of domestic violence occurred between Shannon and her paramour, Darell H., during which T.F. and her siblings, A.H. and N.H., were present. The petition observed T.F. had been the subject of Peoria County case No. 14-JA-8, which arose due to domestic violence between Shannon and Darell H., as well as Shannon's mental health problems. Shannon was indicated by the Illinois Department of Children and Family Services (DCFS) for "Substantial Risk of Physical Injury/Environment Injurious and Environmental Neglect" on January 16, 2014, "Substantial Risk of Physical Injury/Environment Injurious" on June 28, 2014, and "Inadequate Supervision" on July 3, 2017. The trial court granted the petition and made the children wards of the court.

¶ 5	On November 18, 2024, the State filed an amended petition to terminate Shannon's parental rights, alleging she was an unfit parent because, *inter alia*, she failed to make reasonable progress toward the children's return to her care during the nine-month period from December 29, 2019, until September 29, 2020. See 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 6	During the fitness hearing on December 2, 2024, Carmen Kliss, the casework supervisor assigned to the children's cases during the relevant nine-month period, testified Shannon was required to complete a mental health assessment and psychological evaluation, engage in individual counseling, complete parenting and domestic violence classes, cooperate with DCFS, consistently attend visits with her children, and maintain stable income and housing. Shannon "was very difficult to work with," and she would behave uncooperatively and make threats against the agency and caseworkers. Shannon would often call Kliss or the assigned

caseworker, Demetrious Franklin, multiple times in a day, and if her calls were not answered quickly enough, she would call the agency's front desk to "ask if the caseworker was high or drunk." Shannon once tried to contact the agency's chief executive officer because she did not receive an immediate response from Kliss. Shannon believed the caseworkers "were after her," and Kliss described Shannon as "very paranoid." Shannon threatened to obtain a restraining order against Franklin. When Shannon reported she had been struggling to breathe and was experiencing "a lot of stress," Kliss suggested she should go to the hospital, and Shannon interpreted this to mean Kliss wanted her to die. Kliss testified Shannon "struggled to understand her part in why the kids were removed from her care," and she appeared to believe Kliss and Franklin "were trying to take the kids away from her." Based on Shannon's mental and emotional instability, neither Kliss nor Franklin would go to her house because they "were not sure what she would do." As a result, they were unable to conduct a home and safety check during the nine-month period in question.

¶ 7 Shannon initially refused to sign the necessary releases because she did not want Kliss to know her information. Shannon attended most of her scheduled visits with the children, but she would miss approximately one visit per month without providing an explanation. Shannon completed a psychological evaluation, parenting classes, and domestic violence classes. She engaged in individual counseling, but her attendance was sporadic. According to Kliss, during the relevant nine-month period, it was not a viable option to return the children to Shannon's care because she had not maintained stable housing or income, was not cooperating with DCFS, and had not demonstrated mental stability.

¶ 8 Christie Tomaszewski, a licensed clinical social worker who provides outpatient therapy, testified Shannon was her patient from 2020 until 2024. Shannon initially said she did

not need counseling. Tomaszewski diagnosed Shannon with posttraumatic stress disorder (PTSD), and she testified Shannon's lack of self-care, inability to communicate effectively, and difficulty regulating her emotions were symptoms of her PTSD. Tomaszewski testified that, during their counseling sessions, she only managed to address Shannon's symptoms, not the underlying cause of those symptoms. Specifically, Tomaszewski hoped to perform "a type of trauma intervention" to address Shannon's PTSD, but other issues requiring immediate attention would arise, which prevented Shannon from engaging properly with the treatment Tomaszewski hoped to perform. Tomaszewski testified they started to process Shannon's trauma "at various points," but they were unable to make meaningful progress. Shannon was prescribed medications to help with mood stabilization, but she did not always take those medications as prescribed. According to Tomaszewski, Shannon had improved her emotional regulation skills, but her complex trauma remained unaddressed.

¶ 9        Amanda Schenck testified she was the caseworker assigned to the children's cases from January 2021 until December 2023. Schenck confirmed Shannon usually attended visits with the children, but, approximately once a month, she would miss a visit, often without giving a reason. In April 2021, Tomaszewski advised Schenck that Shannon had not attended counseling since October 2020. When asked about this, Shannon said she did not believe she needed counseling.

¶ 10        During the relevant nine-month period, Shannon lived with her mother. Her mother's house was not a viable return home option because caseworkers were not permitted into the house to conduct an inspection and Shannon and her mother "had a history of domestic violence including orders of protection." When Schenck told Shannon that her children would not be returned to her custody if she continued to live in her mother's house, Shannon said she

would move to a shelter. Schenck testified that Shannon made this assertion at least five times during the three years in which Schenck was involved in the case, but she moved to a shelter on just one occasion, "for a week or two maybe" in 2023, before returning to her mother's house.

¶ 11 Shannon Doubet testified she was the casework supervisor currently assigned to the children's cases. Doubet testified Shannon only had one child and family team meeting with DCFS during her time as the case's supervisor, despite Doubet's efforts to schedule more. Shannon would either fail to respond when presented with possible dates for a meeting or cancel due to illness, asserting she "was taking medication that prevented her from being out in the heat." When presented with an alternative date, she would state "she couldn't be out in the heat because it was over 100 degrees," and "she had an appointment that day and still couldn't do it." Shannon described child and family team meetings as "a waste of time." As of October 2024, Shannon was not a viable return home option for the children due to ongoing concerns with her mental health, instability, lack of cooperation, and failure to make progress addressing the reasons for the children's removal from her care.

¶ 12 The trial court found the State proved by clear and convincing evidence that Shannon failed to make reasonable progress during the relevant nine-month period. The court highlighted Tomaszewski's testimony stating she was unable to address Shannon's underlying trauma, which was at the core of Shannon's mental health, behavioral, and emotional needs. The court found she did not make reasonable progress because she was not demonstrably closer to the children's return to her care after the nine-month period in question.

¶ 13 This appeal followed.

¶ 14                                    II. ANALYSIS

¶ 15 On appeal, Shannon argues the trial court's unfitness finding was against the

manifest weight of the evidence. We disagree.

¶ 16    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). To terminate an individual's parental rights, the State must first show the parent is an "unfit person" and then show that terminating their parental rights serves the child's best interests. *D.F.*, 201 Ill. 2d at 494-95. Both showings must be made by clear and convincing evidence. *D.F.*, 201 Ill. 2d at 494-95. "The trial court is given broad discretion and great deference in matters involving minors." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). We will not reverse a trial court's finding of parental unfitness unless it is against the manifest weight of the evidence, as such a determination "involves factual findings and credibility determinations that the trial court is in the best position to make." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 17    A parent can be considered an "unfit person" under the Adoption Act if they failed to make reasonable progress toward the child's return during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is an objective standard. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. A parent makes reasonable progress toward reunification when "the progress being made *** is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 18    Shannon contends the trial court's unfitness finding was manifestly erroneous because, during the relevant period, from December 29, 2019, until September 29, 2020, she

completed domestic violence classes, took a psychological evaluation, and attended individual counseling sessions. However, she was also required to cooperate with DCFS, complete a mental health assessment, complete parenting classes, attend visitation regularly, and maintain stable income and housing. The evidence presented during the fitness hearing showed she refused to cooperate with agency staff and her behavior demonstrated severe distrust, paranoia, and mental instability. Shannon would threaten caseworkers and supervisors, and she was convinced they were "after her." Because of Shannon's mental instability, Kliss would not go to her house out of fear for how she would react. Kliss could not conduct a home and safety check during the nine-month period as a result. While Shannon began engaging in individual counseling, her attendance was sporadic, and she did not, at any point, adequately address her underlying trauma. Shannon initially refused to sign releases because she wanted to prevent caseworkers from knowing her information. While Shannon attended most visits with the children, the record shows that she missed at least one visit per month, often without providing an explanation.

¶ 19　　　　　Ultimately, returning the children to Shannon's care was not a viable option at any point during the relevant period because she had not maintained stable housing and income, was not cooperating with DCFS, and had not demonstrated mental stability. Based on the evidence presented, we cannot say the progress Shannon made from December 29, 2019, until September 29, 2020, was of such a quality that the trial court would have been able to order the children to be returned to her care "in the *near future*." (Emphasis in original.) *L.L.S.*, 218 Ill. App. 3d at 461. Accordingly, the court's finding of unfitness was not manifestly erroneous, as the opposite conclusion was not clearly apparent. See *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 20　　　　　　　　　　　　　　III. CONCLUSION

¶ 21　　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 22        Affirmed.